## No. 12,871.

### A. DELPIT ET AL VS. LIZZIE YOUNG.

#### SYLLABUS.

51  923
s52 1071

1. Where the nullity charged against a marriage is relative and not absolute, the contracting parties retain their *status,* as married persons, until such nullity is ascertained and declared by a competent court.
2. In such case the father of the minor, emancipated by marriage, has no

right of action, in himself, to sue for the nullity of such marriage, and his minor son does not need his aid in bringing the suit.

3. Nor does the female minor, emancipated by such marriage, need a tutor or curator, nor the authorization of her husband, nor of the court, in order to enable her to defend such suit.

4. An appellee who files an answer to the appeal praying that the judgment appealed from be affirmed, will not be heard, through the argument of counsel, complaining of the basis upon which such judgment rests.

5. The words "mistake in the person," as used in Articles 91 and 110 of the Civil Code ,which prescribe the cause for which marriages may be annulled, do not mean, mistake in the character of the person, or in his, or her, attributes, condition in life, or previous habits.

ON APPEAL from the Civil District Court for the Parish of Orleans. *Rightor*, J.

*Albert Voorhies* for Plaintiff, Appellant.

*Theo. Cotonio* for Defendant, Appellee.

Argued and submitted March 24, 1899.
Opinion handed down April 3, 1899.

The opinion of the court was delivered by
MONROE,. J.

### STATEMENT OF THE CASE.

Auguste F. Delpit, "acting in his own behalf and as natural guardian of George Augustin Delpit, his minor son," and George Augustin Delpit, "suing for himself," allege that George Augustin Delpit, then twenty years old, was married in this city, September 28th, 1897, without his father's knowledge or consent, to Lizzie Young, the defendant, and that said marriage was, and is, null and void for the reasons: 1. That said Delpit was a minor, living under the paternal roof, and his father and mother have never consented to his marriage, but objected thereto as soon as they were informed of it, and still object. 2. That said Delpit, in consenting to said marriage, was deceived and imposed upon, and was in error as to the person whom he was marrying, in that she represented herself, and he believed her, to be a virtuous woman, whereas, as he has been informed since said marriage, she had previously been living in illicit connection with divers persons—

one of whom is named in the petition.   It is further alleged that said
Delpit would not have married defendant if he had not been led to
believe that she was virtuous and of previous good moral character.
The prayer of the petition is that the marriage be invalidated and
declared null and void.

Defendant excepted on the following grounds:

1.   That she is a minor and incompetent to stand in judgment.

2.   That as a married woman she is incompetent to stand in judg-
ment without the authorization of her husband, or the court, and that
no such authorization has been obtained.

And, in the event that these exceptions are overruled, she further
excepts:

That the allegations of the petition are too vague and indefinite,
and that they disclose no cause of action.

These exceptions were argued before, and taken under advisement
by, the learned judge a quo, April 25th, 1898.   Upon May 4th, follow-
ing, a supplemental petition was filed in which plaintiffs allege that
immediately after the discovery by him of defendant's immoral co-
habitation before marriage, as charged in the original petition, George
Augustin Delpit broke off all connection, and has never since co-
habited with her.   Upon this supplemental petition there was an
order of court authorizing it to be filed, and authorizing the defendant
to stand in judgment, but the supplemental petition was not served
upon defendant, nor was she cited to answer it, and thereafter, in
that condition of the case, there was judgment maintaining the "ex-
ception," and dismissing the suit.

The plaintiffs have appealed, and the defendant has filed an answer
to the appeal praying that the judgment be affirmed with damages
as for frivolous appeal.

In the course of his oral argument, counsel for defendant called the
attention of this court to the fact that the supplemental petition
had not been served on his client and that she had not been cited to
answer it; and suggested that the averments contained in it should be
disregarded in passing upon the exceptions, which, as he claims, were
only addressed to the original petition.

It will be observed that the defendant is not complaining of the
judgment of the court a qua, but, on the contrary, has filed, in this
court, a written answer to the appeal, praying that that judgment be
affirmed.   The suggestion, therefore, that the judgment in question

lacks the essential elements of citation and service of petition, *quo ad,* .at least, so much of plaintiff's case as is stated in the supplemental .petition, is illogical. He cannot attack the basis upon which the judgment rests and, at the same time, ask that the judgment be affirmed, and, as the latter request has been placed of record, as part ·of the pleadings in the case, we are of opinion that he cannot be heard to urge the former by way of argument. Gayoso de Lemos vs. Garcia, 1 N. S. 326-7.

Dealing with the question of the capacity of the parties litigant, it is evident that the nullity charged against the marriage is relative, and not absolute, from which it follows that until said marriage is annulled by a judgment of a competent court the contracting parties .occupy the *status* of minors emancipated by marriage. This being the case, the husband needs no tutor or guardian to aid him in bringing the suit, and his father, having no right of action on his own account, is a supernumerary in the case. If the wife's *status* as a minor, emancipated by marriage, could be disassociated from her *status* as a married woman, the same thing might be said of her. ·"The minor, emancipated by marriage," says the Code, "can appear in courts of justice without the assistance of a curator. The husband who is a minor, can also authorize his wife to appear therein, whether she is a minor or of full age." C. C. 300. See also C. C. 362. C. P. 110.

Considering the question with reference to defendant's *status* as a married woman, it was said in *Favaron vs. Rideau, 14th Ann., 805;* that. "the object of the law in requiring the authorization of the husband, or court, before the wife can be sued, is fully accomplished when the husband joins the wife in the answer to the suit, even if they have not been designated as husband and wife in the petition," and the reason which underlies this construction applies with greater force to the present case, where the husband does not authorize the wife, merely by implication, to appear in court, but invokes the authority of the court to compel her to appear; whilst, the court, upon the other hand, could not refuse to hear her, without denying a sacred right, guaranteed by the fundamental law. *Lacoste et al. vs. Guidroz et al., 47th Ann., 295.*

Considering, now, the exception of "no cause of action;" it is addressed to the two following propositions which the plaintiff, husband, relies on, as embodying his cause of action, to-wit.:

1. That the plaintiff was a minor when the marriage took place, that he did not have the consent of his parents, and that he did not furnish proof of such consent to the officer to whom he applied for permission to marry, and, hence, that the marriage was, and is, null.

2. That inasmuch as he was led to believe that he was marying a virtuous woman, when in point of fact the defendant had previously led an immoral life, there was a mistake in the person within the meaning of articles 91 and 110 of the Civil Code.

The first of these propositions is answered by article 112, Civil Code, which provides that "The marriage of minors contracted without the consent of the father and mother, cannot, for that cause, be annulled."

The second proposition finds a divided support in the refined analyses of some of the commentators on the Code Napoleon. The following are the provisions of that Code, and of the Civil Code of Louisiana, bearing upon the subject:

"C. N. 146. Il n'y a pas de mariage lorsqu'il n'y a point de consentement.

"C. C. 91. No marriage is valid to which the parties have not freely consented. Consent is not free:

"1. When given to a ravisher, unless it has been given by the party ravished after she has been restored to the enjoyment of liberty.

"2. When it is extorted by violence.

"3. When there is a mistake respecting the person whom one of the parties intended to marry.

"C. N. 180. Le mariage qui a été contracté sans la consentement libre des deux epoux, ou de l'un d'eux, ne peut être attaqué que par les epoux, ou par celui des deux dont le consentement n'a pas été libre.

"Lorsqu'il y a eu erreur dans la personnel, le mariage ne peut être attaqué que par celui des doux epoux qui a été induit en erreur.

"C. C. 110. Marriages celebrated without the free consent of the married persons, or one of them, can only be annulled upon application of both the parties, or of that one of them whose consent was not free. When there has been a mistake in the person, the party laboring under the mistake can alone impeach the marriage."

Under the old law, in France, the only exception to the rule that nullity of marriage, by reason of error in the person, existed only where the error was one of physical identity, was where a slave was taken in marriage in the belief that such slave was free.

*Pothier.  Traite du contrat de marriage.  Nos. 308, 310 and 311.*

When the Code was under discussion before the council appointed by him, the Emperor Napoleon, then, as Marcadé remarks, "only thirty-one years of age," took a very active part in that discussion, and appears to have given the assembled jurisconsults his views in very plain language, "exercising," according to the author mentioned, "a much greater influence than one could believe." He told them that they had not even the *idea* of the institution of marriage, and that a particular article, which they had favorably considered, would produce results in conflict with his system, and the proposed text was thereupon rejected. Among other things, in the same connection, he appears to have insisted that "error in the person," as a ground for annulling a marriage, should be considered as meaning the same thing, or as including within its meaning, "error in the character, attributes or quality of the person."

Thus, he is quoted as having said to the Council: .

"Rappellez-vous ce que vous avez dit sur les nullités. *L'erreur des qualites,* que vous appelez *erreur du personne,* permet de faire annuler le mariage."

Marcadé, Vol. 1, p. 475.

Nevertheless, the articles to which he referred were incorporated in the Code as they have been hereinabove quoted, and this, notwithstanding the fact that as the law was then construed, the most that was claimed was that "error in the person," as a ground of nullity, extended to, and included, error in social, as well as physical, identity. That is to say; that it included, or might include, a case where a woman, marrying a man in the belief that he is a nobleman, of high social position, learns afterwards that he is a liberated convict. The only exception admitted by Pothier, however, to the rule of physical identity, is in the case of a slave supposed to be free, whilst as to other claimed exceptions, he says: "Il est en autrement lorsqu'elle ne tombe que sur quelque qualité de la personne. Par exemple si j'ai épousé Marie, la croyant noble, quoi qu'elle soit de la basse roture; ou la croyant vertueuse quoi qu'celle se fut prostituée; ou la croyant de bonne renommé quoi qu'elle ait été flétrie par la justice; dans tous ces cas, le mariage que j'ai contracté avec elle ne laisse pas d'etre valable, nonobstant l'erreur dans laquelle j'ai été a son sujet." Traité du contrat de Mariage No. 310.

It is said by Marcadé that the change in the French law was effected, more particularly, by the second paragraph of article 180 of

the Code Napoleon, which is fairly translated by the second paragraph of article 110 of our Code, and, so translated, reads:

"Where there has been a mistake in the person, the party laboring under the mistake can, alone, impeach the marriage."

And the learned author claims that this paragraph contemplates error in the qualities of the person, rather than in the physical identity, and that it can contemplate nothing else. He, therefore, considers as embraced within its meaning such cases as the following, to-wit:

Where one of the parties proves to be impotent. Where one marries a prostitute, believing her to be virtuous. Where one, being a Catholic, marries a person who has taken vows. Where one marries a liberated convict, believing him to be honorable. Where one, being a Catholic, contracts a civil marriage with a person who thereafter refuses to receive the benediction of the church.

Upon the other hand he thinks that to annul a contract so sacred as that of marriage, the error should be profoundly grave, and that it should be personal with respect to one of the contracting parties; and that if one marries a person believing him to possess talent, or to be versed in science, when he has, and is, neither; or marries a person believing him to be rich, when in fact he is poor; or believing him to be noble, when in fact he is plebian; the marriage ought not to be annulled for these reasons.

He also thinks that the *status,* or, perhaps it is, the probable sensitiveness of the party who is deceived, ought to be considered, for he says that the prostitution of the woman, and the fact that the man has been a convict ought not to be considered if the other contracting party, in the first case, is himself, a person of no great morality; and if, in the second case, it turns out that the convict was more unfortunate than criminal.

And—finally—he concludes that the whole matter ought to be left to the discretion of the judge, to determine, in any given case, whether either party to a marriage contract has been mistaken or deceived in the other, and if so, whether the matter is sufficiently serious to justify him in declaring the contract null and void.

The author mentions but two cases in which his theory had been applied under the Code Napoleon. The one, decided in 1811, where one of the contracting parties proved to be a priest, and the other, de-

cided in 1827, where an adventurer passed himself off, in marriage, as an Italian baron,—both marriages being annulled.

Demolombe seems to be much of the same opinion as Marcadé, whilst other French writers shade off into various degrees of perplexity.

It will be observed that the Civil Code was first adopted in Louisiana before either of the cases referred to by Marcadé had been decided, and hence, in all probability, at a time when the interpretation of the French law as given by Pothier and the other writers still obtained and there was no reason to suppose that any other interpretation would be placed on it.

Our present Code was approved, as an act of the General Assembly, in March, 1870. It was adopted in the English language, by a legislative body composed, mainly, of English-speaking members, and, whilst we are not informed as to how many of them were familiar with the Code Napoleon, or with the commentaries upon that Code, we think it probable that the language contained in the articles under consideration was used rather because it was found in our previous Codes than because of any intention to adopt the theories of the French commentators on the Code Napoleon. So that, if we are to be influenced by the French interpretation of the French law, as operating on the minds of our legislators, the logical thing would seem to be, not to endeavor to find out what that interpretation is, amid the multiplicity and contrariety of opinion of the later writers, but to go back to the time of the adoption of our Code of 1808, when, as we have seen, *"erreur dans la personne,"* was interpreted to mean but little, if anything, more than error in the physical identity of the person.

Beyond this, it must be remembered that the views of these later commentators are to be considered with reference to the conditions by which they were surrounded, and for the purposes of which they interpreted the law. There was a State church and a national religion; and a social fabric built up of classes separated by wide and deep gulfs. There were strong influences, therefore, pulling in the direction of that construction of the law whereby the marriage of a priest, vowed to celibacy, would be decreed null, and whereby the marriage of an adventurer, masquerading as a nobleman, would be similarly dealt with. But in Louisiana the church and State are separate; we have no distinctions between princes and peasants, but all men are

.born free and equal, and marriage, in the eye of the law, is purely and absolutely a civil contract. The law prescribes who may enter into it; how it may be entered into; and specifies the causes for which it may be annulled or avoided.

Under these circumstances it seems better to interpret our marriage law without the aid of criticism which is inappropriate to the condi-tions under which it was enacted and to which it is intended to apply. And, so interpreting it, we think that if the General Assembly had .intended that a marriage should be annulled when the one party mis-takes the character, the social standing, the pedigree, the acquire-ments, the pecuniary means, the habits, the temperament, or the re-ligion of the other, or when the one party, after the marriage, dis-.covers "redhibitory" vices in the other, some language, beyond the words "mistake respecting the person," would have been found to ex-press that intention. If the marriage of a woman is to be annulled because she was unchaste before marriage, what is to be done in the .case of a man? If the courts are to determine whether the, mistake is sufficiently serious, how are they to deal with people who, having united themselves together for better, for worse, in sickness and in health, etc., present a case where the one develops hereditary disease, such as consumption, or insanity, of the possibility of which the .other was ignorant; or becomes confirmed in a pre-existing alcohol or .opium habit of which the other had no knowledge? No such doctrine .as that propounded by the learned counsel for the appellant has, as yet, found a place in our jurisprudence, and the language of our Code, 'interpreted according to familiar canons of construction, does not justify its introduction.

In 1897, a case was presented to the High Court of Justice in Eng-land where it appeared that the defendant, wife, was actually pregnant at the date of the marriage, without the knowledge of the husband, and gave birth to a child shortly afterwards, thus imposing upon the unfortunate husband a child not his own. The court reviewed the entire jurisprudence of the English courts, compared it with that of· the continent of Europe, criticized adversely certain American cases, and in a most elaborate and exhaustive opinion, reached the con-clusion that, by the law of England, error as to the chastity of the wife is not such a "mistake as to the person" as will entitle the·de-·ceived husband to annul the marriage, such an error not involving the

want of consent for which alone marriages can be annulled under the English law.

*Moss vs. Moss.* (Otherwise Archer.)

Law Reports. Probate Div., p. 262.

The case is not one in which the appellee is entitled to damages. The judgment appealed from is therefore affirmed at the cost of the appellant.

The CHIEF JUSTICE and MR. JUSTICE BLANCHARD dissent.