Manuel Rosado Marzán, Plaintiff and Respondent, *v.*
Marcelina Rivera García, Defendant and Petitioner.

No. 11576. Submitted June 3, 1957.—Decided March 30, 1959.

*José R. Fournier* for petitioner. *Mario A. Rodríguez* for respondent.

Mr. Justice Pérez Pimentel delivered the opinion of the Court.

Manuel Rosado Marzán filed an action of divorce against his wife Marcelina García, before the Superior Court of Puerto Rico. In an amended complaint he alleged as cause of action that "at the time the defendant married the plaintiff she was pregnant by another man, the plaintiff not having had any sexual relations with the defendant until they were married, and that the defendant gave birth on February 20,

1954, exactly six (6) months and three (3) days after the date of their marriage"; "that this action on the part of the defendant toward the plaintiff, deceiving him in such a way, has caused him serious emotional and spiritual anxiety, since the defendant, whom he believed to be a virgin at the time of marriage, was pregnant at that time."

Defendant requested the dismissal of this complaint on the ground that it did not state facts sufficient to constitute a cause of action. After said motion was denied, she answered making a general denial of all the facts.

After a trial on the merits, the lower court entered judgment decreeing the divorce between the parties on the ground of cruel treatment and grave injury on the part of the wife towards the husband and it declared furthermore, that the child born of the marriage on February 21, 1954 is not the son of the plaintiff Rosado Marzán. In support of said judgment the lower court made only the following findings of fact:

"The evidence has convinced the court that on August 17, 1953 Manuel Rosado Marzán was married to Marcelina Rivera García; that when Marcelina married Manuel she was already pregnant by another man, who is not the plaintiff; that the plaintiff became aware of this situation and thereupon returned Marcelina to her father and explained to him the reason for such a sudden decision. Defendant gave birth on February 21, 1954. By August 17, 1953, when she was married, she was already pregnant and the father of the child was not precisely Manuel Rosado Marzán, who had returned from Germany on June 24, 1953, after serving in the army.

"The court concludes that the attitude assumed in this case by Marcelina Rivera García involves cruel treatment or grave injury and on such ground judgment will be entered granting the complaint, ordering the defendant to pay costs, plus one hundred dollars ($100) to plaintiff for attorney's fees."

On appeal defendant-appellant charges the trial court with several errors. However, it will be sufficient to consider the most important one, namely: whether the facts

alleged and proved constitute the cruel treatment or grave injury prescribed by our Civil Code as ground for divorce.

The supervisory power over the institution of marriage, its constitution, regulation, and dissolution are matters within the province of the Legislature, since they concern political and public interest. Consequently, divorce, which is one of the forms of dissolving marriage, may only be granted in the manner and upon the grounds prescribed by the statute.[1]

Our Civil Code, in its § 96 (31 L.P.R.A. § 321), enumerates ten grounds for divorce. There are no others. The antenuptial pregnancy of the wife by another man at the time of marriage and unknown to the husband, does not appear expressly in our Code as one of the grounds for divorce. Unless this fact is considered as sufficient to constitute the "cruel treatment or grave injury," indicated by the said § 96 of the Civil Code in its paragraph 4 as ground for divorce, the action of divorce raised by the plaintiff-appellee in this case does not lie.

On multiple occasions we have examined the conduct of one of the spouses towards the other to determine, if for the purposes of divorce, such conduct constitutes cruel treatment or grave injury.[2] However, never before have we passed on the question now at issue. Neither have we found any decision in American jurisdictions supporting concealed pregnancy of the wife by another man at the time of marriage and furthermore, unknown to the husband, as the cruel treatment and grave injury prescribed by the statute as ground

---

[1] *Pérez* v. *León*, 52 P.R.R. 497; 17 Am. Jur. § 7 at 150; 27 C.J.S. § 8 at 527; Keezer, Marriage and Divorce § 4 at 10; Schouler, Divorce Manual § § 12 and 13 at 14 *et seq.; Kasal* v. *Kasal,* 35 N.W.2d 745, 746, and cases cited in footnote 1; *Gerber* v. *Gerber,* 64 N.W.2d 779, 781; *Moody* v. *Moody,* 288 P.2d 229, 230; *Fix* v. *Fix,* 204 P.2d 1066.

[2] See *Morales* v. *Vélez,* 75 PR.R. 901; *Bosch* v. *Ruiz,* 68 P.R.R. 873; *Marques* v. *Rivera,* 68 P.R.R. 666; *Gómez* v. *Trujillo,* 59 P.R.R. 470; *Arce* v. *Lebis,* 50 P.R.R. 857; *Manich* v. *Quero,* 38 P.R.R. 83; *Forteza* v. *Enrich,* 18 P.R.R. 28; *Morales* v. *Rivera,* 8 P.R.R. 442; *Cruz* v. *Dominguez,* 8 P.R.R. 551.

for divorce. Discussing what constitutes "mental cruelty," Nelson, in his work Divorce and Annulment, Vol. 1 § 6.06 at 222, says that the acts which may constitute mental cruelty, or be asserted to do so in themselves or in connection with others, present an almost infinite variety and include such matters as concealment of antenuptial pregnancy. In support of this declaration the said author cites the annotations in 13 A.L.R. 1435; but a brief examination of said annotation shows that the case law cited therein has not decided that antenuptial pregnancy of wife by another man at the time of marriage and unknown to husband, constitutes cruel treatment or grave injury. What happens is that the statutes of some states prescribe that ground as action of divorce. In other states the conduct of the wife upon concealing her pregnancy by another man at the time of marriage, is considered as fraud which will authorize the husband to request an annulment of the marriage.[3] It is significant, however, that in those states where antenuptial pregnancy is ground for divorce (see footnote 3), cruel treatment is listed as an additional separate and independent ground for divorce.[4]

---

[3] Antenuptial pregnancy of the wife by another man at the time of marriage and unknown to the husband is ground for divorce in the states of Alabama, Arizona, Georgia, Iowa, Kansas, Kentucky, Mississippi, Missouri, New Mexico, North Carolina, Oklahoma, Tennessee, Virginia, and Wyoming. See Vernier, 2 American Family Laws 66–71; Ploscowe, The Truth About Divorce 264–294; Annot., 13 A.L.R. 1435; Keezer, Marriage and Divorce § 491 at 528 (3d ed.). In other states antenuptial pregnancy is ground for annulment and not for divorce. For a full study on this question, see 2 Bishop, Marriage, Divorce and Separation 208–219. Law reviews that deal with the question of pregnancy as ground for divorce or annulment are: Kingley, *Fraud as a Ground for Annulment of a Marriage*, 18 So. Cal. Law Rev. 215; *Recent Cases*, 91 U. of Pa. Law Rev. 473; Robert E. Lull, *Annulment of Marriage for Fraud*, 32 Cornell L. Q. 424; Walter L. Miller, *Annnulment of Marriage for Fraud: Antenuptial Pregnancy*, 6 Cornell L. Q. 328; *Recent Decisions*, 15 Va. Law Rev. 387.

[4] This is so except in the states of North Carolina and Virginia, where cruel treatment is ground for separation but not for absolute divorce. 2A The General Statutes of North Carolina § 20 at 622 (1950); 4 Code of Virginia § § 20–25 at 410 (1950).

In Central America, the codes of the republics of Honduras, Nicaragua, and El Salvador, include as ground for divorce the pregnancy of a woman by another man prior to the marriage when this condition is unknown to the husband at the time of marriage. However, said codes also list ill-treatment and grave injuries as another ground for divorce. Ireland & Galíndez, Divorce in the Americas 186, 210, and 245 (1947).

 In view of all the foregoing it may be concluded that the *antenuptial pregnancy* of the wife has not been considered as cruel treatment or grave injury towards the deceived husband and that divorce has been granted only on that ground, in those jurisdictions where the statute expressly gives it as ground for divorce.[5] In the absence of a statute to the contrary, divorce means dissolution of the bonds of matrimony *for some cause arising after marriage* based, naturally, upon the theory of a valid marriage.[6] Certainly, it can not be said that the deceit of the wife concealing from her husband her pregnancy by another man at the time of the marriage is a fact that arises after the marriage. We must bear in mind that precisely the plaintiff in this case bases his action of divorce on the concealment of the physical condition of defendant. Plaintiff discovered the fact after the marriage, but the act of cruelty, if any, does not consist in the wife's having continued to conceal her physical condition after the marriage. If we were to characterize defendant's attitude as cruel, we would have to refer to her antenuptial attitude to the concealment of pregnancy at the time of and prior to the marriage which, according to plaintiff, has caused him serious emotional and spiritual disturbance; but the acts of cruelty or grave injury before marriage

---

[5] 17 Am. Jur., *Divorce & Separation* (1957) §§ 144 *et seq.* at 352; Annot. 15, A.L.R. 2d 694.

[6] *Rambo* v. *Rambo*, 16 So. 2d 4; *García* v. *García*, 232 S.W. 2d 782, 783 (1950); *Mazzei* v. *Cantales*, 112 A.2d 205, 208 (1955); *In re Crump's State*, 166 P.2d 684, 688 (1946); *Goff* v. *Goff*, 125 P.2d 848, 852 (1942).

are not ground for divorce in Puerto Rico.[7]　We decide, consequently, that the action of divorce does not lie in the case at bar.[8]

The judgment on review will be reversed and another entered instead dismissing the complaint, with costs.

Mr. Chief Justice Negrón Fernández and Mr. Justice Saldaña dissented.

MR. JUSTICE SERRANO GEYLS, concurring.

I agree in part with the evaluation of the judicial function made by Mr. Justice Saldaña in his dissenting opinion.　However, I believe that there is a vital element missing from that evaluation and furthermore, that the circumstances of this case do not permit the exercise of the judicial discretion urged by the dissenting opinion.　These reasons, and the significance of the question raised, force me to write a separate opinion in which I shall examine the scope of the dissenting proposition, the historic circumstances under which our legislation has developed, the differences between the situation in France and ours, and the attitude and actions of our legislators concerning the family institution.

I

The dissenting opinion does not propose that we interpret the phrase "grave injury" as to include exclusively the concealment by the wife of antenuptial pregnancy by another man.　This is only an application—perhaps the most ex-

---

[7] Louisiana recognizes only two ways, other than by the death of one of the parties, by which the dissolution of marriage may take place, to wit, by divorce or by annulment.　The latter two grounds of dissolution supplement each other, for while a divorce can obviously be granted for causes which occur only after the marriage, annulment can be decreed only for a cause which existed prior to the marriage or contemporaneously with it.　24 Tulane Law Rev. 217; Vernier, *supra*, vol. 1, § 50 at 239.

[8] However, by the manner the controversy was raised, by virtue of the allegations and the evidence introduced, we have not passed to consider whether or not plaintiff-appellee has a right of action for the annulment of the marriage.

treme—of a more elaborate proposition, recommending the adoption of deceit or fraud as ground for divorce, provided it conforms to the following five requirements: 1—the fact be concealed in bad faith; 2—the concealment be prolonged at least until the marriage; 3—the fact be of a serious nature; 4—not notorious, and 5—be totally unknown to the other spouse. In order to apply those requirements to concrete situations the standard suggested is "the sense of justice that is a part of the convictions or beliefs that actually influence the people in a community."

It is indispensable, in my opinion, to give greater concretion to that proposition in order to gauge its scope adequately. It is not necessary to use imaginative resources for that purpose, since fortunately, the experience of several countries offers us valuable illustrations. Let us examine what has occurred in the United States, Germany, and France.[1] In the former two, fraud or deceit is a ground for annulment, while in the latter, and by interpretation of the phrase "grave injury," it is a ground for divorce. Although this entails important differences as to the effects worked on the spouses, on the children and the property acquired during the marriage depending on the positive law of each jurisdiction, it has no bearing concerning the end pursued here: to illustrate with real situations the scope of the doctrine.

In American jurisdictions, where fraud is accepted as a ground for annulment,[2] the rules for general contracts are applied to marriage, and it is required that concealment, aside from having induced the complainant to contract matrimony, must be of sufficient importance to warrant an intervention of the state in a status of great public interest. It is generally required that such conduct affect the essential relations

---

[1] A valuable analysis of Roman, Canonical, French, Italian, German, Swiss, Brasilian, and Argentine law is found in 1-3 Alberto C. Spota, *Tratado de Derecho Civil* (1957).

[2] See in general Kingsley, *Fraud as a Ground for Annulment of a Marriage*, 18 So. Cal. L. Rev. 213 (1945); Vanneman, *Annulment of Marriage for Fraud*, 9 Minn. L. Rev. 497 (1925); 55 C.J.S. 866.

of marriage. Although there are important divergences among the states as to the contents of these general categories, of which New York [3] stands out as the most liberal, it is possible to enumerate a list of situations arising before marriage which constitute fraud when concealed from the other spouse. They are the following: antenuptial pregnancy by another man, either by concealing the fact or inducing the husband to believe that the child is his; misrepresentation of pregnancy or that a child already born belongs to the husband; a contagious and incurable disease, generally, a venereal disease; [4] sterility; a mental illness that is not manifest at the time of the marriage ceremony [5] or a mental illness in the family; absence of love or affection when it is coupled with the secret intention not to consummate the marriage nor appropriate money or property of the other spouse and abandon him; conviction of crime, particularly if the deceived person is a young inexperienced woman; perjury upon obtaining the marriage license; race, when it is in violation of a law that prohibits the integration of races; citizenship, when the effect is the expatriation of the wife or when the other spouse has required citizenship as a specific condition of the marriage; poverty, if the deceived person is a young inexperienced woman, or if defendant has married with the sole purpose to have access to plaintiff's money; a prior marriage, when the deceived person is young and inexperienced, or when there is a violation of a law that prohibits marriage before certain time has elapsed after the divorce decree; the intention not to consummate the marriage or to do so

---

[3] The New York decisions are discussed in Kingsley and Vanneman, *ops. cit. supra* and in 32 Cornell L. Q. 424 (1947) and 3 La. L. Rev. 831 (1941).

[4] Some states have included tuberculosis and epilepsy.

[5] This situation must not be confused with the one produced when a person is mentally unbalanced at the time of the marriage. See, Shea, *The Effect of Insanity at the time of Marriage*, 16 La. L. Rev. 511 (1956): Wisdom, *Marriage—Contractual Capacity—Insane Persons*, 28 Tul. L. Rev. 403, (1954).

only by use of contraceptives; the refusal to have a religious ceremony following the civil marriage, where a promise has been made to such effect.[6]

In Germany, error as well as deceit are grounds for annulment. The former refers to the error of identity and to the error concerning certain essential qualities. The latter covers the case where "in terminating the marriage, one of the contracting spouses errs on certain qualities of the other and, had he known the true situation and pondered rationally over the essence of marriage, would have abstained from contracting it."[7] The personal qualities, as commented by Kipp-Wolff, are "those traits that characterize an internal good of the personality, in contraposition to the characterization determined by the personal goods or position acquired by the person."[8]

". . . Therefore, personal qualities are: in the first place, all bodily characteristics, for example, virginity, fertility, health, race, age, also birth; secondly, all the moral qualities, such as kindness, honorableness, flexibility, self-control; thirdly, all the spiritual qualities as intelligence and artistic ability. On the contrary, it being immaterial whether the concept of quality is more strictly applied or whether the personal aspect of the quality is denied, the name, nobility, profession, status within a certain family (so that, for example, a spouse who ignores that the other is not a child by marriage, or the Catholic spouses who ignore that they are related in a canonical degree, which results in an impediment of marriage, cannot attack it), the condition of member of a corporation of public or private law (municipality, nationality, member of an ecclesiastical community), social status and, finally, patrimony are, for such purposes personal qualities.—It is immaterial whether the quality is

---

[6] Some states have accepted several of these situations as grounds for annulment only when the marriage has not been consummated.

[7] 1–IV Ennecerus-Kipp-Wolff, *Tratado de Derecho Civil* (2d ed. 1953).

[8] *Id.* at 153.

innate or acquired (illness) or whether it constitutes a means of identification, as well as whether in principle, it is lasting or transitory." [9]

Subsequently, and based on German cases, Kipp-Wolff comment on the conditions affecting the essence of marriage.

"Thus, avarice and the vice of squandering, stupidity and conceit, indiscretion and irascibility, nervousness and susceptibility to diseases in general (or to a particular illness) and including a certain tendency to lie, will seldom authorize the one who ignores them to attack the marriage. It rather deals with qualities which need not be tolerated not even by one who is willing to suffer serious deceits. For this purpose great importance will be attached to the conceptions prevailing in the social sphere of the spouses. As grounds for attack, the following deserve special attention: error concerning the virginity of the bride, ignorance as to having been born outside marriage, the ignorance of incurable *coendi impotence*, and also, undoubtedly, sterility, homosexualism, a serious mental illness (as epilepsy, *dementia præcox*, idiocy from birth, morphinism, etc.), ignorance of serious and incurable bodily injuries or, at least, chronical (such as tuberculosis, consumption, non-cured sexual disease), ignorance of criminal tendencies, immoral conduct, serious habit of lying, dipsomania." [10]

In Germany, the fundamental difference between error and deceit, in the aspect which concerns us here, is that in the latter "circumstances which are not personal qualities can be ground for attack, if the error concerning them has been induced by deceit."

"Of special importance are deceits about degrading penalties suffered by one of the betrothed or their parents, or the existence of paternal consent, deception as to the intention

---

[9] *Id.* at 153.
[10] *Id.* at 154.

to receive the ecclesiastical blessing after the marriage, or to educate the children in a specific religion, concealment of a dishonorable profession or one which is way beneath the bride's social condition, or the existence of children prior to the marriage, or an operation that destroys the possibilities of bearing children." [11]

In France, although the Code sanctions the *error as to the person* as ground for annulment, the courts have interpreted it restrictively to include solely the error as to the *identity* of the person and not as to his *qualities*. On the contrary, they have elaborated the ground for divorce known as "grave injury" so as to cover fraudulent or deceitful acts performed prior to the marriage and unknown to the spouse requesting the divorce. Compliance with two conditions is required: the fact must be of such seriousness that if known it would have led the other spouse not to contract matrimony, and it must have been concealed from the other spouse or, at least, not revealed to him.[12] Under those circumstances, the following facts have been accepted by the French case law:[13] impotency of the husband, physical malformation of the wife that precludes consummation or conception, misrepresentation of pregnancy, venereal diseases, antenuptial pregnancy by another man or the existence of a child, lack of virginity in the wife, ecclesiastical status of the husband, mental illness, conviction for an act contrary to honor and moral, entry of the wife in the registry of prostitutes, promise to a third person of an important sum that the future husband could not pay were it not for his wife's fortune, fraudulent promise to educate a child in the Catholic religion or to have a religious ceremony following the civil marriage.

---

[11] *Id.* at 156.

[12] 2 Dalloz, *Repertoire de Droit Civil* 127 (1952).

[13] *Id.* at 127–28; *Id., Mise a Jour* 60 (1958) and Aubry and Rau, *Droit Civil Francais* 227 (1948).

As may be noted from this brief summary of the American, German, and French experience,[14] the acceptance of fraud or deceit as a ground for divorce would constitute a very radical innovation in our family law that would deeply affect our marriage system. I do not believe I exaggerate when I say that in statistical terms,[15] as well as by its impact on the institution of the family and on the provisions of law, it would become the most important ground for divorce in our country, probably with a greater affluence than "grave injury," as the latter is conceived at present.

[14] So as not to unduly extend this opinion I have only included in this summary the facts that each country has accepted as constituting fraud, deceit or concealment, and I have eliminated those that the courts have rejected. However, I believe that to obtain a complete view of the matter it is convenient to become acquainted with the latter also. For such purpose the works mentioned in the footnotes should be consulted.

[15] I am referring, of course, to adversary divorces. I presume that the grounds for separation, desertion, and grave injury, having become in practice accommodative means to obtain a divorce "by mutual consent," shall continue to provide, as up to now, the great majority of not adversary divorces. The data furnished by the Office of Court Administration reveal that the following is the situation which has prevailed in the last three years as to adversary and not adversary cases:

| Cause | 1955–56 | | 1956–57 | | 1957–58 | |
|---|---|---|---|---|---|---|
| | Adv.[a] | Not Adv. | Adv. | Not Adv. | Adv. | Not Adv. |
| Desertion | 91 | 1660 | 41 | 1657 | 36 | 1726 |
| Adultery | 15 | 284 | 12 | 238 | 13 | 332 |
| Conviction | | 5 | | 5 | | 7 |
| Drunkenness | | 6 | 1 | 4 | | 1 |
| Insanity | | 4 | 2 | 1 | | 5 |
| Separation | 157 | 2563 | 69 | 2679 | 56 | 3232 |
| Grave Injury | 81 | 1445 | 42 | 1321 | 71 | 1698 |
| Impotency | | | | 1 | 1 | |
| Corruption of son | | | | | | |
| Proposal to prostitute wife | | | | | | |
| Total | 344 | 5967 | 167 | 5906 | 177 | 6861 |

[a] It refers to suits in which a hearing was held with the attendance of both parties and a controversy was really raised. The "not adversary" include all the others. The highest number of "adversary" cases in 1955–56 is due solely to the fact that some of the sections of the Superior Court did not apply the definition properly.

## II

Let us examine briefly the historical circumstances.

*First:* Neither the modern Spanish legislation [16] nor the Puerto Rican legislation has ever *expressly* recognized deceit or fraud as a ground for annulment of marriage or as a ground for divorce. In fact, outside the United States,[17] the jurisdictions that have adopted one of these two methods are very few. Luis Fernández Clérigo, in his book *El Derecho de Familia en la Legislación Comparada* (1947), states that such countries as Germany, Switzerland, Sweden, Estonia, and Portugal, in Europe, and Argentina and Mexico, in Latin America, have accepted deceit or fraud or any of its types as ground for annulment (at pp. 110–12), but he does not mention a single one that has accepted it as ground for divorce [18] (at pp. 130–37).

*Second:* The Puerto Rican legislators received at the beginning of the century a specific proposition to adopt "fraud" as ground for annulment of marriage but they did not approve it. The Report of the Commission to Revise and Compile the Laws of Porto Rico (1901) proposed in § 17 of "An Act Regulating Marriage and Divorce," the following: " . . . when the consent of either party shall have been obtained by force, duress or fraud, the marriage shall be void from the time its nullity shall be declared by a court of competent authority, as provided in the next title." [19]

*Third:* Antenuptial pregnancy by another man has not been *expressly* included either in the Spanish legislation or in ours as ground for annulment or divorce. As stated in the opinion of the Court, some states of the American Union

---

[16] Due to time limitation I have been unable to examine the Spanish legislation prior to the nineteenth century.

[17] The prevailing situation in the United States is described both in the majority and dissenting opinions.

[18] See, also, the outline of European and American Codes in 2 Scaevola, *Código Civil* (5th ed. 1946), 27–291.

[19] Vol. II at p. 639.

and the republics of Honduras, Nicaragua, and El Salvador, have such provisions. As far as we know, none of the European countries have followed suit.

*Fourth:* Neither the Spanish decisions nor any of the commentators of the Spanish Civil Code has accepted the interpretation of the ground of "grossly abusive or insulting language or conduct" of said Code (§ 105), which is the immediate precedent of ours, in the sense of including fraudulent or deceitful antenuptial acts of one of the spouses: The only reference that we have found to that question appears in Scaevola,[20] who, owing to the fact that Spanish case law is "fortunately so sterile," resorts "by way of instructive antecedent" to French case law and includes in the judgments he enumerates some authorities supporting such interpretation.

In reality, as far as we know, that interpretation has not been adopted by the United States, or by Latin America, or by Europe, with the exception of France and Belgium.

*Fifth:* Spanish decisions have not yet recognized that deceit or fraud can be incorporated to the ground of annulment known as *error as to the person* by way of interpretation. After asserting that "concealment, mental reserve or deceit do not affect . . . the validity of marriage, with respect to which the Code keeps silent" Castán [21] wrote in 1955:

"The question is raised, legitimately—we have said elsewhere—as to whether that error of which the Code speaks strictly means the error as to identity of the person, or whether it also concerns, as in § 1.266 and in the canonical precedents, the qualities enjoyed by the person. The complete lack of authorities applicable to the problem renders the solution difficult, since on the one hand the necessity of

---

[20] *Op. cit.* at 785–87.
[21] 5 *Derecho Civil Español, Común y Foral* (1955) 125, 129.

security in the marriage relations is adduced, while on the other, attention is at least drawn to the importance of the marriage act and the importance of giving the consent freely and without any defect. If it is understood that the formula of the legal precept embraces, as constituting errors of the person, not only error as to the identity (difficult and rare case in practice), but also as to the personal qualities, this last modality must be confined, by analogy to the provisions of § 1.266 dealing with error in the thing which is the subject matter of the contract, to such qualities of the person as may be considered essential in the measure prevailing in the social sphere of the contracting parties.

We have examined the Spanish decisions subsequent to 1954, and we have not found a single judgment with respect to this problem.[22]

Puig Peña,[23] Manresa,[24] Scaevola,[25] and Sánchez Román,[26] share Castán's interpretative view, while Valverde,[27] Fernández Clérigo,[28] and Martínez Ruiz [29] prefer a more restrictive solution which does not admit error as to the qualities of the person, but only as to his identity.

Referring to the error as to the qualities of the person, Fernández Clérigo states that "the opinions differ largely on this type of error as a defect of consent, sufficient to annul the marriage, but the truth is that it is accepted by

---

[22] Interpreting the provision of the Spanish Code this Court decided in *López v. Valdespino*, 6 P.R.R. 171, 177 (2d ed. 1904), that error as to the person must be such as to vitiate the consent, but not merely an accidental condition of the person of the other contracting party.

[23] 1–II *Tratado de Derecho Civil Español* (2d ed. 1953), 159.

[24] *Comentarios al Código Civil Español* (7th ed. 1956), 543, 620.

[25] *Op. cit.* at 709, 710.

[26] 1–V *Estudios de Derecho Civil* (1912), 434, 539.

[27] 4 *Tratado de Derecho Civil Español* (1938), 148–49.

[28] "The Spanish [legislation] (§ 144 of the Civil Code) admits only the error on the identity of the person and by no means as to his qualities." *Op. cit.* at 108.

[29] 1 *El Código Civil* (1900) 421.

very few legislations." [30] He states further that France,[31] Italy, and Mexico do not accept it, while Germany and Switzerland do.

Louisiana is the only state of the Union that expressly recognizes mistake of the person as a ground for annulment. Following the French precedents, it also interprets that error as referring exclusively to the identity of the person. Sections 91 and 110 of the Civil Code; *Delpit* v. *Young*, 25 So. 547 (1899); *Stier* v. *Price*, 37 So.2d 847 (1949); 23 Tul. L. Rev. 582 (1949).

*Sixth: The error as to the person* as ground for annulment was eliminated from the Puerto Rican legislation in the codification of 1902, and it has never been reinstated. Muñoz Morales considers that it was an omission due to "the haste" of the legislators, who in carrying out the revision of the Code, "did not notice that such circumstance was present in the Spanish Code, in the Louisiana Code, the French and Italian Codes, and in the same bill enacted by that Commission [Code of 1902]." [32] Perhaps the preceding explanation is correct, but several factors militate against it. In the first place, it is a very important provision on an essential matter in family law. Secondly, it expressly appeared in the bill that the Code Commission submitted to the legislators. Thirdly, it was also eliminated from the second paragraph of § 111 (179) of the Revised Code of 1902), which provides who can request an annulment of marriage, notwithstanding the fact that it also appeared in the Spanish Code (§ 102) as well as in the bill of the Code Commission. Lastly, the same legislators of 1902, who eliminated error as to the person as a ground for annulment

---

[30] *Op. cit.* at 108.

[31] In France there is a jurisprudential trend to relax that doctrine. See 3 Dalloz, *op. cit.* at 359 (1953), where it is also stated that several commentators favor that trend.

[32] *Reseña Histórica y Anotaciones al Código Civil de Puerto Rico* (1947) 203.

of marriage, kept it as a ground for annulment of contracts —§ § 1232 and 1233 of the Code of 1902, now § § 1217 and 1218 of the Code of 1930—as it appeared in § § 1265 and 1266 of the Spanish Code. In the absence of other evidence, these factors lead us to believe that we are dealing with a deliberate elimination and not an involuntary omission caused by "haste." Besides, had this omission been involuntary originally, it is rather hazardous to think that our legislators have "involuntarily" maintained that system of law for more than half a century.

Whether it is a deliberate elimination or not, the unquestionable fact is that since 1902 *error as to the person* does not exist in Puerto Rico as a ground for annulment of marriage, thereby doing away with the only provision in the Spanish and Puerto Rican historical law that would have allowed a marriage to be invalidated on the ground of error as to the identity or the essential qualities of one of the spouses.[33]

### III

Considering that the dissenting opinion suggests the use of French case law as a guide to our own, we must necessarily examine, although briefly, the historical circumstances [34] under which such case law developed.

The Revolution at the end of the eighteenth century produced, as in so many other aspects of French institutional

---

[33] It is obvious that I am not describing the historical trend of our legislation and of its immediate Spanish precedents in order to decide on this sole basis the question raised in this case. It is too late, of course, to let the method of Savigny and his followers exclusively rule our mental processes. But the historical investigation, if used moderately, is a valuable instrument for interpreting the law and its efficacy should not be underestimated. "Since law is, in one of its aspects, a historical product, we must become acquainted with the past history of an institution, in order to understand well its present meaning and anticipate its future." Castán, *Teoría de la Aplicación e Investigación del Derecho* (1947), 105. See, also, Hernández Gil, *Metodología del Derecho* (1945), 65–100.

[34] See 1 Planiol-Ripert, *Traité Elementaire de Droit Civil* (3d ed. 1946), 384; 1 Colin y Capitant, *Curso Elemental de Derecho Civil* (1952), 437–49; 1 Bonnecase, *Elementos de Derecho Civil* (1945) 553–54.

life, a radical change in the legislation concerning divorce. Not only was the religious principle of indissolubility rejected —"the power to get a divorce stems from the individual liberty that would be lost by an indissoluble bond," proclaimed the law—but in listing the grounds for divorce they went to the extreme of including mutual consent and incompatibility of characters. Later on, the Civil Code maintained the institution of divorce but eliminated the ground of incompatibility and made it more difficult to obtain a divorce by mutual agreement. In 1816, with the resurgence of Catholicism as the religion of the state during the Restoration, divorce was suppressed by law. It was not until 1884 that it was reestablished and has remained in force ever since, although important changes have been made in the last years.

In the light of that history, Planiol-Ripert assert that in France the institution of divorce has been "bound to the conquest of liberty and the political regime" and has been a subject for heated arguments between Catholics and anticlericals.[35] This condition, together with other social tendencies,[36] explains, in my opinion, the case law of that country. On the one hand, the legislative power, probably due to serious partisan conflicts, has produced a legislation deeply influenced by the religious concept of marriage as an indissoluble bond, which is obviously manifested in the small number of grounds that it states as constituting cause for divorce (adultery, conviction of crime, corporal attack and grave injury).[37] On the other hand, the judges, upon seeing

---

[35] *Op. cit.* at 386.

[36] Planiol-Ripert (*op. cit.* at 387), mention the following: abandonment of religious beliefs, teaching of a moral that is not based on the spirit of sacrifice, the desire of each person to lead and ruin his own life. Surely, one must add to these the deep effects that economic development, industrialization, urbanization, mass education, and the democratic system must have had on the family, and particularly on the position of the wife, in France as well as in the other modern countries.

[37] Colin y Capitant, *op. cit. supra* at 445-96, describe the "painstaking and skillful campaign" that it was necessary to carry out against the "very vivid protests" to obtain the reinstatement of divorce at the end of the nineteenth century, and add: "We should note the marked modera-

how the every-day problems of conjugal life and the ferments of a steadily changing society lead to judicial controversies, have naturally felt the suffocating effect of that legislation and have made of "grave injury" a useful vehicle to accommodate the law to such social change. Planiol-Ripert say in this respect: "Together with the precise facts provided by the law, and which actually constitute the specific grounds for divorce, there is a *general formula, injury*, which has the value of a principle susceptible to indefinite applications. Since then all the barriers have been torn down, and the truth is that we have in France *an unlimited number of specific grounds for divorce.* They have been determined by the courts and not by law." [38]

And Fernández Clérigo adds: "As we have just seen, in French law the limited number of grounds for divorce and the narrow concepts in which the latter appears within the legislative framework have been supplied by a very broad interpretation of grave injury made by the courts which has generously unraveled a doctrine born of judicial discretion, in terms that may perhaps indicate an extralimitation.

"Nevertheless, we are forced to recognize that in the majority of the cases, the French courts have been moved by serious situations which reality has brought before them and which could not be ignored." [39]

Since French case law follows the trend of a practically blanket interpretation of the ground of "grave injury," [40] it

---

tion to which the promoters of reform had to confine themselves to have its principle admitted. . . . There is no doubt that the legislator of 1884, even more than the one of 1804, intended to make divorce a remedy of exception, which meticulous courts grant sparingly to homes that are in disagreement."

[38] *Op. cit.* at 392. Author's italics.

[39] *Op. cit.* at 132.

[40] Aside from the facts which are hereinafter mentioned (footnote 44), the following have been considered as "grave injury": voluntary communication of syphilis, refusal to receive the wife's relatives, refusal of the husband to discharge or allow to discharge a servant who has been disrespectful to his wife, refusal of the husband to have the common children baptized, abusive vigilance over the wife's mail or on domestic

was an easy task to incorporate therein the concealment of facts occurred prior to the marriage.[41] They have per-severed in that interpretation, and this, in my opinion, is the definite proof of the unbalance existing in France between legislation and case law even though § 232 of the French Code was amended in 1941 so as to provide that injury should consist of a violation of the duties and obliga-tions "arising from the marriage." Notwithstanding this strong legislative indication, the French courts continued to interpret the law as they had done formerly and holding, therefore, that injury can have its origin in the concealment of faults prior to the marriage.[42]

## IV

Should the French situation be assimilated to ours? I believe not. In the first place, in Puerto Rico divorce has not generally been the object of heated arguments and much less has it been "bound to liberty and political regime." It is not within our province to investigate why the institution has been so generally accepted in a country predominantly Catholic. The unquestionable fact is that, except for some isolated protests, there is an almost complete agreement of all the social classes with the prevailing legal provisions and no serious attempts have been made to change their scope.

---

management of the home, injurious silence, gambling vice. Planiol, *Tratado Elemental de Derecho Civil* (1946), 30–31. The French law expressly provides that "afflictive and degrading" criminal conviction is ground for divorce. However, the courts have interpreted that a conviction in which those two conditions are not present may constitute a "grave injury" because of the shameful publicity which the fact entails. The injury consists in not having foreseen the affront and not having avoided it by refraining from committing the offense. 2 Dalloz, *op. cit.* at 126.

[41] It is desirable to clarify that although this is the controlling decision, approved by the Court of Cassation, it is not unanimous with the French courts nor with the commentators. In 2 Dalloz, *op. cit.* at 127 there is a recital of the judgments and the commentators who do not approve the majority rule.

[42] Aubry and Rau, *op. cit.* at 227 (1948); 2 Dalloz, *op. cit.* at 127 (1952), where the contrary opinions of distinguished French commentators on the effect of this amendment are also stated.

Secondly, and using Fernández Clérigo's classification,[43] our legislation, contrary to the French, belongs to the group that "state the grounds for divorce specifically and in detail and as a general rule in an express manner." Having been authorized initially by a military order of March 17, 1899, absolute divorce received its first civil sanction in § 164 of the Revised Code of 1902, today § 96. That article enumerated eight grounds for divorce, five taken from the Spanish Code (adultery, criminal conviction, cruel treatment or grave injury, corruption of children, and proposal of the husband to prostitute his wife) and three from Louisiana (drunkenness, desertion, and impotency). Later, in 1937, there was added separation of both spouses for a period at first seven years and later—1942—was reduced to three, and in 1938, incurable insanity. I believe that the legislative technique of long and detailed enumeration that has been employed in our country suggests to us a more restrictive interpretation of the law of divorce than the one prevailing in such jurisdictions as France,[44] Germany, and Switzer-

---

[43] "To determine the grounds on which the so-called necessary divorce can be based, some legislations follow the system of stating a single ground . . . ; of citing a reduced number of those grounds endowing them, at times, with sufficient elasticity to compromise multiple events that can arise in conjugal life; or stating the grounds for divorce specifically and in details and as a general rule in an express manner." In establishing this classification Fernández Clérigo (at p. 130), considers England as an example of the first system; France, Switzerland, and Germany, as examples of the second, and Panama, Venezuela, Mexico, Cuba, and the Spanish Act of 1932, as examples of the last.

[44] An examination of the French decisions—2 Dalloz, *op. cit.* at 117–27; Rau and Aubry, *op. cit.* at 219–27; 1 Planiol-Ripert, *op. cit.* at 396–400—shows that the courts of that country in their interpretation of the ground of "acts of corporal attack and grave injury" have adopted as grounds for divorce several of the grounds expressly stated in our law. Desertion or separation by one of the spouses, drunkenness, and even passion for gambling, brutal and corrupt conduct toward the children, the attempt to prostitute the wife, impotency, if it has been concealed or if the husband refuses to undergo medical treatment, and conviction of crime in certain circumstances, have been considered as grave injury that render living together intolerable. On the contrary, incurable impotency or insanity occurring after marriage have not been accepted.

land.[45] It seems reasonable to believe that after taking the trouble of establishing a long list of grounds for divorce, the legislator meant to create a more precise and concrete formula than the one that would have resulted from the opposite method and thus reduce judicial discretion. That legislative method is of special relevancy when it concerns incorporating into our law, by way of interpretation of one of those causes, a ground for divorce of such enormous proportion and so vitally important as deceit or fraud. Likewise, and continuing this analytical examination, we should not disregard the fact that our law contains a ground of the so-called objective or guiltless nature—separation for three years—by virtue of which the legislator undoubtedly planned to offer a remedy for those conjugal difficulties not specifically found among the other nine grounds.[46]

Finally, our legislators have given exemplary attention to family law, particularly in the past few years. From 1933, seven amendments have been introduced to the provisions regulating divorce [47] and so many to the other provisions on the family institution that it would be tedious to enumerate

---

[45] In Germany, the judges have used the ground of "serious violation of the marital duties" in the same broad manner that "grave injury" has been used in France, although without applying it, as we stated previously, to the concealment of faults prior to the marriage. Fernández Clérigo, *op. cit.* at 133; Kipp-Wolff, *op. cit.* at 228–31. The same thing has happened in Switzerland with the provision that permits one "to request divorce when the conjugal bond has been so deeply impaired that living together becomes intolerable." Fernández Clérigo, *op. cit.* at 135.

[46] I am also conscious of the serious limitations suffered by every interpretation which refers solely to the text of the law and tries to fix its meaning through the exclusive use of grammatical and logical processes. But in this case also, Castán, rightly so, advises us that "no matter how colorless the exegetical operation is, we must recognize that it constitutes the basis and indispensable antecedents of any further work on positive law and there is no possibility of reaching a scientific result unless we start from a strict understanding of the texts of the law." *Teoría de la Aplicación e Investigación del Derecho* 83.

[47] Three of them refer to the grounds for divorce, the other four to diverse aspects of procedure and to the problems of *patria potestas,* support, etc. See Muñoz Morales, *op. cit.* at 93–104.

them.[48] Although the legislative action could be criticized for the absence of scientific rigour in the incorporation of new standards to the Civil Code,[49] it is fair to recognize that such action has been coupled with social changes and has been based on generous views of human equity. Such trend culminated, as we know, in Article I of our Constitution which forbids in its pertinent part discrimination by reason of sex, birth, origin or social condition. That keen legislative sensibility toward the family institution, so many times shown in the last few years, deters us, once more, from introducing any fundamental change in the legal standards. In view of such history it is fit to conclude that if deceit or fraud is not today a part of our divorce or annulment law it is because there have been no social requirements demanding it.[50]

## V

I agree that judicial interpretation of the laws should not be governed exclusively by logical or historical processes and that, whether it is admitted or not, on every occasion

[48] Muñoz Morales includes in his book a complete relation of the amendments introduced to the Civil Code from the beginning of the century until 1947, op. cit. at 44—121. From these at least thirty-five affect the institution of the family. In the last decade eleven more amendments have been made. See ·the volumes of the laws of Puerto Rico of 1948—pp. 90, 202, 228; 1949—pp. 416, 544, 780; 1950—pp. 288, 666; 1952—p. 920; 1953—p. 304; 1958—p. 114.

[49] I consider it my duty to call the attention of the distinguished legislators of the country to the deplorable state of Book I of the Civil Code from the point of view of scientific order and language accuracy. A mere reading of the commentaries of Muñoz Morales suffices to make us realize that there is urgent need for a revision of the Code in order to correct those serious deficiencies.

[50] We have found no evidence that in the last decades the question of amending the law by adding the ground of deceit or fraud has been raised before the Legislature. Neither has the matter been the object of public discussions. In the law reviews we have only been able to find a brief commentary on the subject. Velázquez, *Puede Admitirse el Dolo como Causa de Nulidad del Matrimonio en Puerto Rico?* 10 *Rev. Jur. U.P.R.* 440 (1941).

when there is need to choose one of two or more probable meanings, the judge necessarily resorts to value judgments. I accept equally, that on numerous occasions the legislator being prevented from embracing the social reality by means of precise and detailed formulas, then designs a broad principle trusting that, pursuant to the purpose of the law, judicial discretion will apply it justly as the infinite changes of our daily life continually crop up. Our historical law, particularly the Civil Code, contains copious examples of these principles. Section 1802 of that Code,[51] which establishes liability for acts or omissions, may perhaps be cited as the best example. In applying those standards there arises an inescapable judicial responsibility of adapting them, as far as possible, to the changing conditions of society, of adding at each instant, without doing violence to their letter or purpose, a new breadth which will permit them to keep abreast of such changes as the guiding rules of social conduct.

However, that task of adaptation cannot be transformed, even in the cases of the most generous legislative delegation, into a purely creative process. In doing that work the judge occupies, by operation of the system, a position subordinate to that of the legislator. The latter has the primary responsibility to initiate the basic changes in public policy and he hands down to the judge the command, at times precise and unequivocal, other times confusing and inaccurate, to which he must adjust his interpretation. The judge, therefore, has the duty to make that conception of his traditional function an essential part of his value judgments and he must orientate his conduct so as to find a meaning and not to create independently a new or better social standard.

One of the great American jurists writes:

---

[51] "A person who by an act or omission causes damage to another when there is fault or negligence shall be obliged to repair the damage so done."

"The vital difference between initiating policy, often involving a decided break with the past, and merely carrying out a formulated policy, indicates the relatively narrow limits within which choice is fairly open to courts and the extent to which interpreting law is inescapably making law. To say that, because of this restricted field of interpretive declaration, courts make law just as do legislatures is to deny essential features in the history of our democracy. It denies that legislation and adjudication have had different lines of growth, serve vitally different purposes, function under different conditions, and bear different responsibilities. . . . Even in matters legal some words and phrases, though very few, approach mathematical symbols and mean substantially the same to all who have occasion to use them. Other law terms like 'police power' are not symbols at all but labels for the results of the whole process of adjudication. In between lies a gamut of words with different denotations as well as connotations. There are varying shades of compulsion for judges behind different words, differences that are due to the words themselves, their setting in a text, their setting in history. In short, judges are not unfettered glossators. They are under a special duty not to over-emphasize the episodic aspects of life and not to undervalue its organic processes—its continuities and relationships. For judges at least it is important to remember that continuity with the past is not only a necessity but even a duty." [52]

Another jurist, equally famous, but with a background in civil law, formulates a similar thought:

"The jurist, in conclusion, must work not only on laws positively enacted, but also on juridical principles and concepts in keeping with social policies and facts. But let us not draw therefrom exaggerated consequences that may not

---

[52] Félix Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Col. L. Rev. 527, 534 (1947).

be adaptable to our judicial system. Puig Brutau goes perhaps too far when he says that the center of gravity of law making, even in the countries of codified law, dwells in the decision of particular cases and not in the formulation of general principles, and when he tells us that the judge-made law is the primary source of objective law. It is advisable, in the face of such bold conclusions, to maintain at all costs the subordinate position of the judge to the law, or rather—since statutes and the law are not identical—to the statutes and the general principles of the law. There is, surely, law making in a judicial judgment. But this creation operates on objective legal and juridical premises. The judge or the jurist has the burden of the inescapable mission of particularizing the law, integrating it with new solutions and within certain limits adapting it to life and rejuvenating it. But this mission cannot alter the function of the law imposed by those juridical commands which like ours, depend on the existence of general principles of positive law that must be applied and adapted to particular cases. In short, in our judicial system there is an original and proper *creative* formulation of positive law, which is incumbent on the legislator, and an elaboration that might be called *reconstructive* of law, which operating with positive law as well as with natural law, is incumbent on the judges. We should not underestimate either one or the other." [53]

The interpretation of broad and flexible legal precepts presents to the judge a challenging test. On the one hand he has to make an effort to adapt those principles to the practical realities of social life and that adaptation necessarily involves value judgments. On the other hand, he has to realize his subordinate position within the system and search eagerly in the law, history, general principles of law

---

[53] Castán, *La Formulación Judicial del Derecho* (2d ed. 1954), 25–27. Author's italics. The citations have been eliminated.

and the basis of the political regime for the landmarks that limit the boundaries of his discretion. These are not, I realize, precise categories, and the conflict between both produces, on specific occasions, grave and painful perplexities.[54] The efficiency of the legislator in the choice of words and his great care in making clear the underlying purposes both in the law as well as in the varied sources which are included under the heading of "legislative materials," contribute strongly to reduce the extent and intensity of the conflicts. The judge, in what concerns him, needs to be constantly alert to the basic differences between the legislative and judicial function and he should have an "instinctive as well as trained" reluctance [55] to confuse them.[56]

I should add that it seems extremely venturesome to assert that in order to decide the problem before us it suffices to make use of *the* "civil law method" and that it is due to

---

[54] In *Irizarry* v. *People*, 75 P.R.R. 740 (1954), a question of interpretation of similar scope to the one at bar was raised before this Court. The dissenting opinion proposed to reject the doctrine of "contributory negligence" that had governed in Puerto Rico since the beginning of the century, by interpretation of § 1802 of the Civil Code, and to install in its place the doctrine of "comparative negligence." In concurring with the majority opinion, opposed to that change, Mr. Justice, today Chief Justice Negrón Fernández, said: "Its . . . adoption [of the doctrine of comparative negligence] would not be, in my opinion, authorized under the present state of our legislation. In the interpretation of the statutes the judicial authority cannot be so broad as to impinge on the functions and powers which dwell in the legislative branch. . . .

"The matter under discussion falls within the ambit of the public policy of the State, which is no province of the judicial power. I believe in the necessary evolution of the law and in the re-examination and modification of jurisprudential concepts and doctrines, as a judicial function essential to maintain the progress of the ideals of superation and of justice to mankind. But I cannot concur in progress through a glorifying judicial omnipotence at the expense of legislative power." (P. 748.)

[55] Frankfurter, *op. cit.* at 535.

[56] The considerations which I have stated here on the interpretation of statutes are not, of course, applicable to the constitutional construction. The latter is ruled by other standards, and in construing them, the judge is not in a subordinate position to the legislator, although he owes him, naturally, deep respect for his determinations.

*that* "method" that French courts have so acted. No method has that magic quality. True that civil legislation makes use of formulas and principles conceived in a broad and flexible manner with much more ease than the Anglo-American and, as a general rule, rejects enumeration.[57] True, also, that that technique, whenever used,[58] produces the effect of broadening the ambit of judicial interpretation. But accepting these realities is not deciding the problem of interpretation. It is, at the most, an initial step, but the real mystery still lies ahead.

What should the judge do once he crosses that threshold? Will he reduce his discretion exclusively to the letter of the precept? Will he attempt to go further and apply logical, systematical, philosophical, historical, sociological, teleological elements? One or several? If several, in what proportion, with what emphasis? How far will he go in using them? Within the letter of the law, of the general principles of law? Outside or even against the law and such principles? And how will his own intellectual and moral training, his view of life and people, his perception of the ideals of the community and of public order, his sensibility towards social changes, his capacity for self-limitation, influence his decisions? These, and others of like nature, are the real in-

---

[57] It is well to remember, as we stated before, that it is precisely in deciding the matter at issue that several countries of civil law, among them ours, have abandoned the traditional technique and resorted to long and detailed enumerations. Cuba has 18 grounds for divorce, Panama 11, and Mexico 17. The Spanish Act of 1932 established 13 grounds. Fernández Clérigo, *op. cit.* at 135. Perú has 10 grounds. Castañeda, *Código Civil* (1955), 85.

[58] Castán asserts: "In the second of the great forms of the English law, that of Statute Law, the problem of interpretation and application raises, substantially, identical problems to those that written law raises in the Continent. The English judges, like ours, are forced very often in carrying out their interpretative function, to depart from 'strict law' and resort to superior, historical, logical, and systematical methods, taking into consideration the general meaning and the general purposes of the law." *Teoría de la Aplicación e Investigación del Derecho* 125–26.

terrogations in the interpretation of law and they do not belong exclusively to any system or any law "method." In civil law the diverse positions that stem from those questions have had and still have able defenders.[59] In France the differences between the view expressed by the decisions of the Court of Cassation (shared by civil writers such as Esmein, Vizioz, Aubry, and Rau) and the view of civil writers such as Laurent, Colin, Capitant, Planiol, and Ripert, are due in turn to the differences between the answers that might be given by either one or the other to the preceding questions and not to the fact that some employ *the* "civil law method" while others do not.

It is for the foregoing reasons that I cannot subscribe to the analysis by which deceit or fraud may be incorporated into our divorce law. That analysis is conceived, in my opinion, only in terms as to which is the best solution to the problem in the light of an individual appraisal of the cultural requirements and the "justice" of the case and it does not propose to extricate the meaning of the words along the lines of the juridical, historical, and social course that gives them meaning. "When law becomes silent we could say, following the poet's metaphor, that that silence is full of voices. But when the judge enters his judgment, not only is he an interpreter of the words of the law, but also of its mysterious and hidden voices." [60] In this case the voices of the historical development of the applicable provisions, of the drafting technique, of the absence of social claims, of the vigilant attitude of the legislator, of the magnitude and complexity of the proposed change, and of the reflection on our institutional

---

[59] Examine in the afore-cited work of Castán, pages 55–151, dedicated to an elaborate discussion of *Las direcciones y escuelas metodológicas;* and in Bonnecase, *op. cit.* at 117–176, wherein are discussed *"Las escuelas del derecho civil."*

[60] Eduardo J. Couture, *Introducción al Estudio del Proceso Civil* (2d. ed. 1953), 70.

limitations to order such change,[61] necessarily force me, differently from what I would prefer if my function were to legislate, to share the view that our law does not authorize deceit or fraud as a ground for divorce.

For the reasons set forth in the opinion of the Court and for those that I set forth in this opinion, I agree that the judgment appealed from must be reversed.

---

MR. CHIEF JUSTICE NEGRÓN FERNÁNDEZ, dissenting.

Sixty-four days after marrying the defendant, the plaintiff filed the present action.[1]

In sustaining the complaint on the ground of cruel treatment, the lower court made the following findings of fact:

---

[61] Diverse avenues are open to the legislator in considering this problem. He can refuse to change the present standards and thus provide that no type of deceit or fraud will be legal ground to break the bond. If he rejects the foregoing, he can limit the solution to a specific ground—antenuptial pregnancy, a contagious disease, lack of virginity of the wife, etc.—or use a broad formula, such as deceit or error. Whether he chooses the specific rule or the general principle he will then have to gauge the effects on the spouses, the children, and the property, and choose either annulment or divorce. Even after making this last choice, he will have to prescribe specific rules to decide the problem of the children, who as in the present case, are in the peculiar state of being legitimate by presumption (§ 113 of the Civil Code), but illegitimate for not having been begotten by the husband.

[1] In the amended complaint he alleged the following:

"FIRST: That the plaintiff and the defendant contracted marriage in Toa Baja, Puerto Rico, on August 17, 1953, and have continued legally married.

"SECOND: That the spouses did not beget any children in the marriage nor acquire property of any kind.

"THIRD: That at the time the defendant married the plaintiff she was pregnant by another man, the plaintiff not having had any sexual relations with the defendant until they were married, and that the defendant gave birth on February 20, 1954, exactly six (6) months and three (3) days after the date of their marriage.

"FOURTH That this action on the part of the defendant toward the plaintiff, deceiving him in such a way, has caused him serious emotional and spiritual anxiety, since the defendant, whom he believed to be a virgin at the time of marriage, was pregnant at that time."

"The evidence has convinced the Court that on August 17, 1953, Manuel Rosado Marzán was married to Marcelina Rivera García; that when Marcelina married Manuel she was already pregnant by another man who is not the plaintiff; that the plaintiff became aware of this situation and thereupon returned Marcelina to her father, and explained to him the reason for such a sudden decision. The defendant gave birth on February 21, 1954. By August 17, 1953, when she was married, she was already pregnant and the father of the child was not precisely Manuel Rosado Marzán, who had returned from Germany on June 24, 1953 after serving in the Army."

I share the view of the Court in the sense that, under our law as it now stands, the action of divorce in this case does not lie. Although the opinion of the Court leaves open and does not prejudge the question whether or not the action of annulment is in order, I believe that in view of the averments of the complaint and the evidence heard, the question before the trial court actually centered on the nullity of the marriage and that the action was actually converted into one of nullity.

The special nature of the marriage contract and the public interest involved therein, far from making inapplicable thereto the general doctrine consecrated in the Civil Code relative to the lack of consent in the contracts by reason of deceit or fraud—consisting herein of the concealment by the woman of her state of pregnancy from sexual relations with another man—calls, in my opinion, for a more strict application in order not to subvert the lawful purpose on which is based the marriage institution which is derived therefrom. Such concealment constitutes in itself, because of its very inherent fraudulent character, a moral defect which can not be sanctioned by the State in order to create the fundamental institution of our society.

The marriage contract is the highest ranking contract in the juridical and social order instituted, which entails the most significant mutual obligations in the partnership thus constituted. It is of public law because it is regulated by the

State, and when a man consents to such contract, in good faith, induced by the deceitful conduct of the woman who conceals her state of prenuptial pregnancy which he has not created, such contract is offensive to morals and from its inception the marriage institution which he is about to create is mortally injured because it carries within its entrails the ugly vice of deceit. A marriage thus contracted would not be an institution; it would be a pitiful wreck. The moral basis which, as the essence of every contractual juridical relation, underlies the general principles of the Civil Code and which must be present in the ordinary pacts of a patrimonial character, can not be dispensed with in an agreement which, like the special marriage contract, is governed by the imperative need of honesty. The State can not sanction an institution which emerges from the shattered remains of a wreck, which stems from a contract tainted in its intrinsic social value with the germ of fraud, which can not inspire confidence, which thwarts the very purpose for which it was created, and belies its very essence as an instrument of social usefulness.

The silence of the positive law [2] in the sections dealing with marriage as respects deceit or fraud as a ground for nullity, should not be construed in the sense of barring the right of such action in a case like the present one. Resort must be had to the general principles of law, which are inspired on the moral sense of the law, by operation of § 7 of

---

[2] Felipe Clemente de Diego, *El Silencio en el Derecho*, p. 97 (1925):

"In effect, the Civil Code itself in § 6 [§ 7 of our Civil Code] outlines the course which the judge should follow in the absence of a statute wholly applicable to the point at issue, and, since it invokes in the last instance the general principles of law as the source and inspiration of juridical decisions, we fail to see the reason for excluding the matters relating to the silence of that procedure of integration and enlargement of the juridical order. In the event of silence, it will be possible, at least in principle, to elevate our mind and contemplate those general criteria of justice which might set down the standard for the solution of the cases not provided in the Code.

"The good faith, soul of the general commerce of life and of the com-

our Civil Code, which constitutes sufficient juridical basis for the action of nullity of a marriage which neither society nor the law can impose, because it belies the very aim it pursues and would establish a juridical relation without any useful social purpose.

Consequently, in view of the findings of fact of the lower court, the judgment should, in my view, be modified substituting the pronouncement of dissolution of marriage by that of nullity of marriage, and, as thus modified, it should be affirmed.

---

MR. JUSTICE SALDAÑA, dissenting.

A brief analysis of the opinion delivered by this Court in the appeal taken herein will reveal its full significance: with absolute impunity, the wife can fraudulently conceal from her husband a fact of such solemn importance as her prenuptial pregnancy by another man. In the face of such conduct the husband has no legal remedy. In the first place, the divorce decree that the latter requested in his complaint does not lie. Although it seems unbelievable, the ground of "cruel treatment or grave injury" can not be invoked because the concealment is considered as a fact *prior* to the marriage. On the other hand, the Court decides impliedly that annulment of the marriage does not lie either on the ground of mistake or error as to the person or deceit on the wife's part. Thus, at least legally, the husband has no other choice but to continue his usual married state.

---

merce in a strict sense, should govern social cohabitation and all its acts, good faith frequently invoked in connection with contracts in the civil code and codes of commerce; the fair restrictions of the law which limit private autonomy recognizing the fair dominion of the social order and the respect to the essential bases of the constitution and existence thereof, among which we already find the good faith, the ethical sense, the good customs...; the demand of consideration in the contracts which must be lawful, furnish sufficient data and elements for the admission of the principles relating to the silence as well as to many other new doctrines, as for example, the abuse of the right, which are claiming a place and consecration in our positive legislation."

But is this actually so? In my opinion it seems impossible to admit it. The fraudulent concealment of prenuptial pregnancy is an act of the wife that impairs the conjugal relationship in its very essence. Undoubtedly, the concealment began before the marriage. But it was also contemporaneous with the marriage, and, we must stress, continued for several months afterwards. This implies that it strictly concerns an act *subsequent* to the marriage that seriously mars the honor and feelings of the husband. Its inevitable result is the impossibility of any cohabitation between the spouses. And we must recognize that it also destroys the purposes which, strictly speaking, are essential to the marriage. Which means, in my opinion, that that conduct of the wife constitutes "grave injury" and, therefore, sufficient cause in the legal order to constitute ground for divorce pursuant to § 96 of our Civil Code. 31 L.P.R.A. § 321. I really doubt very much that today in Puerto Rico we apply the maxim *caveat emptor*, with regard to divorce, with the strictness it had in ancient times in mercantile law, or the cynic aphorism that "in marriage he who can will deceive." Thus I am forced to disagree with the majority opinion.

For more than half a century, there has existed in our law the elastic concept of "grave injury" as a ground for divorce. It refers, in general terms, to a serious violation of the mutual duties inherent in the marriage or to a serious offense to the dignity of a spouse. It establishes what Pound calls a "flexible standard" and which Stone with more precision characterizes as a "category of indeterminate reference." See Pound, An Introduction to the Philosophy of Law (rev. ed. 1954), 57–59 and Stone, The Province and Function of Law (1950), 185–86. In effect, the injurious acts are so diverse in nature and form that it would be futile to attempt to anticipate them in the statute. Besides, there is no specific measure or scale to weigh their gravity. That is why the statute only establishes a general term of "grave

injury," which in reality permits the inclusion of a great number of concrete grounds for divorce. Could the legislator disregard that provision and catalogue all the injuries between spouses, with a coefficient of gravity for each category, requiring that a certain total of points, or a certain average be attained each year, in order to entitle one of the spouses to obtain a divorce? Evidently not. The legislator must resort, by sheer necessity, to a flexible and incompletely formulated standard, and delegate his rule-making power to the hands of the judges. Purposely they are endowed with a broad margin of discretion "to decide (each) case in conformance with all the circumstances thereof, dispensing that individual and humane justice which is none other than equity." Castán, *La Formulación Judicial del Derecho* (2d rev. ed. 1954), 108.

Thus, the flexible standard of "grave injury" as a ground for divorce has the function to render the law adaptable to life and to serve in the solution of each individual case. Its application permits and requires primarily an ethical judgment of human conduct. To decide whether "grave injury" exists in a concrete case, the judges can not dispense with the sense of justice that is a part of the convictions or beliefs that actually influence the people in a community. The letter of the legal precept does not acquire sufficient meaning without that notion of complementary value. In other words, only by using all their knowledge, acquired by experience, can the judges determine whether this or that conduct constitutes the normal and typical behavior of the spouses. Ultimately, their decision always depends on the common sense that tells them what is "just" in accordance with the predominating collective convictions. This does not mean, of course, that the judicial decision is free or arbitrary. On the contrary: the judge must be neutral and his evaluation must be objective. But neutrality only means imparting justice in conscience, discarding opinions or personal pref-

erences and avoiding deviations of another type. It does not mean indifference at the inevitable problem of evaluation which is raised when the legal order rules the conduct of the spouses by means of the flexible concept of "grave injury." See Castán, *Teoría de la Aplicación e Investigación del Derecho* 171–173 (1947); Cossio, *El Derecho en el Derecho Judicial* (1945); Recaséns Siches, *Nueva Filosofía de la Interpretación del Derecho* 204–291 (1956); Cahn, The Sense of Injustice 3–50 (1949).

Hence the reasoning as well as the decision of the majority opinion is inacceptable. In my opinion, taking into account the social convictions as to the meaning and scope of "grave injury" as the standard regulating the conduct of the people of Puerto Rico, the husband has the right to obtain a divorce in the case at bar. A wife can not neglect to reveal to her husband a fact of such serious character as her antenuptial pregnancy by another man. Naturally, in order for "grave injury" to exist, it is indispensable that that fact be concealed or misrepresented in bad faith, that is, by deceit or fraud. Besides, since one can not conceal what everybody knows, divorce should not lie if the husband accepted to contract marriage when the pregnancy was evident. But in the case at bar: 1, It involves a deceitful and deliberate concealment of the condition of antenuptial pregnancy. 2, The husband actually ignored that situation completely. 3, The pregnancy of the wife by another man was not so notorious as to warrant its disclosure. 4, The guilty concealment of the wife commenced prior to the marriage, continued during the celebration thereof and until the husband discovered the deceit several months later. Thus, the wife committed an act which undoubtedly constitutes a very serious offense to the dignity of her husband. And once he discovered the deceit, was conjugal life humanly possible? or, did the object of marriage subsist in any way? Our social customs and beliefs prevent it. And in truth we do not need a socio-

logical study to realize that those convictions still prevail in our social atmosphere. The spirit of observation is sufficient.[1]

There is no doubt that grave injury can only be based on the acts committed subsequent to the marriage, or at least, simultaneously with the celebration thereof. In effect, prior to the marriage there can be no offense *against a spouse* nor a breach of the obligations *between the spouses.* But here we are not concerned with an act of the wife strictly prior to the marriage: having had sexual relations with another man and having become pregnant by him. The injurious act in this case consists in the fraudulent concealment and prolonged deceit of the prenuptial pregnancy. That concealment and that deceit began prior to the marriage, but they were also contemporaneous with its celebration. More so: they continued for several months after the marriage. And we must also consider as grave injury the subsequent disclosure of that pregnancy to the husband. So that the special form of injury committed by the wife in the case at bar is logically subsequent to the marriage.

Now then, could it be argued that the proper legal solution is annulment of the marriage (1) by mistake as to the person, or (2) by deceit on the part of the wife? The statute in Puerto Rico does not accept those grounds for annulment of marriage. Sections 69 to 77 of the Civil Code (1930 ed.), 31 L.P.R.A. § § 232–245. As Muñoz Morales states: "It seems, that in the haste of their revision, the legislators of 1902 forgot to include *mistake or error as to the person* as one of the grounds that vitiate or annul the consent; and they did not notice that such ground was present in the Spanish Code and in the Code of Louisiana, in the French and Italian Codes, and in the same bill enacted by that Commission (Code); therefore, the Civil Code of Puerto Rico

---

[1] However, see Steward and others: The People of Puerto Rico, A Study in Social Anthropology (1956), 10–16; 143–48; 158–60; 218–24; 291–94; 375–82; 440–46; 474; Stycos, Family and Fertility in Puerto Rico, chs. V and VI (1955).

does not contain today *mistake or error as to the person* as a ground affecting the consent and validity of marriage." *Reseña Histórica y Anotaciones al Código Civil de Puerto Rico*—Book I, p. 203 (1947). Thus we can not raise in Puerto Rico the problem of whether in the "mistake as to the person" we can admit error of identity and also error in respect to the qualities of the person that can be considered essential "within the evaluation predominating in the social sphere of the contracting parties." V-1 Castán, *Derecho Civil Español, Común y Foral* (7th ed. 1954), 129. *Cf.* 4 Espín Cánovas, *Manual de Derecho Civil Español* 46 (1956). On the other hand, the defects invalidating consent in ordinary contracts are not applicable to marriage. Sections 1217–22 of the Civil Code (1930 ed.), 31 L.P.R.A. § § 3403–3421. And the legislator has expressly established the following causes for invalidity of consent concerning marriage: "1. When given to an abductor by the abducted before the latter has recovered her liberty; 2. When obtained by violence or intimidation." Section 73 of the Civil Code (1930 ed.), 31 L.P.R.A. § 241. Hence the deceit by the wife does not render the marriage invalid. *Cf.* 1 Colin and Capitant, *Curso Elemental de Derecho Civil* (Sp. transl., 3d ed. 1952), 375–405; and Velázquez, *¿Puede Admitirse el Dolo como Causa de Nulidad del Matrimonio en Puerto Rico?*, 10 *Rev. Jur. de la U.P.R.* 449 (1941).

A similar situation exists in France. There deceit is not admitted by operation of law as ground for annulment of marriage. And besides, the antenuptial pregnancy by another man is not considered as a "mistake as to the person" vitiating consent. To prove it we need only quote the following summary of French law: "The three defects of consent that by common law may entail the annulment of a contract are, as is known, error, violence and deceit. In the matrimonial system it happens that, pursuant to § 180 (of the French Civil Code), marriage can be challenged either

because one of the spouses has not given his consent freely, and therefore, has suffered *violence*, or because there has been an *error*. Consequently, it shall be noted right away that the text omits one of the three defects of consent, *deceit*. This silence is intentional. A secular tradition forbids that marriage be attacked by one of the spouses, alleging that his or her consent was obtained through trickery and fraudulent working of the other spouse." 1 Colin and Capitant, *Curso Elemental de Derecho Civil* (Sp. transl., 3d ed. 1952), 375. With respect to the *error* the same text writers state the following: "Evidently here is involved only error as to the person. It is the one provided by § 180, second paragraph. We wonder what is meant by that. Our case law, following the tradition of the ecclesiastical courts, admits (besides the error with respect to physical identity) that there can be error . . . when one is mistaken as to the essential quality of the person. But, what is this essential quality? Our courts say it merely concerns the family status of the individual, or as it is also said, his *civil identity*; for example, where one of the spouses uses a false name or a false civil status to make the other one believe that he belongs to a family to which he is really a stranger. But any error concerning, for example, the physical, moral and even judicial integrity of the individual, is not considered as error as to the person pursuant to § 180." *Ibid.* 376–77.[2]

It is therefore very significant that the jurisprudence of the courts and the doctrine of the French civil writers have considered the deceitful concealment by the wife of her antenuptial pregnancy, as ground for divorce, in construing a provision of law concerning "grave injury" which is identical to the one set forth in paragraph 4 of § 96 of our Civil Code. It should be noted that while in Spain divorce meant the mere

---

[2] See on said questions the more detailed statements appearing in 2 Planiol and Ripert, *Traité Pratique de Droit Civil Francais* (2d ed. 1952) 86–97; 3 Dalloz, *Encyclopedie Juridique—Repertoire de Droit Civil* (1953) 356–59; and 1 Marty and Raynaud, *Droit Civil* 556–60 (1956).

personal separation of the spouses and not the dissolution of the bond, the origin of the ground of cruel treatment or grave injury in Puerto Rico is found in the Spanish Civil Marriage Act of 1870 ("grossly abusive language or conduct inflicted by the husband on the wife") and in § 105 of the Spanish Civil Code of 1889 ("personal violence or grossly abusive conduct"). In turn, the Spanish legislation was taken from § 231 of the French Civil Code which refers to "acts of excess, corporal attack, and grave injury." See 4 Valverde, *Tratado de Derecho Civil Español* (4th ed. 1938), 188 *et seq.;* 1 Manresa, *Comentarios al Código Civil Español* (7th ed. 1956) 628–33; and II–1 Puig Peña, *Tratado de Derecho Civil Español* (1953), 516 *et seq.* In France, "the wife who has concealed her condition of antenuptial pregnancy from her husband commits grave injury (as regards divorce)." I–2 Josserand, *Derecho Civil* 150–51 (Sp. transl. 1950). Or, as it has also been said, "injurious acts must occur for the first time after the celebration of the marriage. However, the majority of authors admit that facts prior to the marriage such as immoral conduct of the wife or her pregnancy can, if concealed from the husband, constitute grave injury. In that case the injury is not so much the prior act as the silence kept by its author. It is the deceit prolonged until the marriage that is considered injurious." 1 Ripert and Boulanger, *Traité Elementaire de Droit Civil de Marcel Planiol* (3d ed. 1946), 400. It is correctly stated that had the husband known about the pregnancy before the marriage, he would not have married.[3] Thus, the experience of the

---

[3] The doctrine in question is set forth and analyzed in: Civ. May 7, 1951 (Dalloz 1951, Jur. 472); Civ. July 5, 1956 (Dalloz 1956, Jur. 609); 49 *Rev. Trimestrielle de Droit Civil* 505 (1951); 57 *id.* 585–86 (1958); 2 Planiol and Ripert, *Tratado Práctico de Derecho Civil Francés* §§ 518 and 531 (Sp. transl. 1939); 2 Dalloz, *Encyclopedie Juridique—Repertoire de Droit Civil* (1952) 113–28; 7 Aubry and Rau, *Droit Civil Francais* (6th ed. 1948) § 476; 2 Planiol and Ripert, *Traité Pratique de Droit Civil Francais* (2d ed. 1952) §§ 518 and 531; I Juillot de la Morandiere, *Traité de Droit Civil de A. Colin et H. Capitant* (1957) §§ 1140–42; and I Carbonnier, *Droit Civil* (1957) § 128–B.

jurists, in a system of civil law containing rules on the annulment of marriage and grounds for divorce which are very similar to ours, ratifies the result of our previous analysis concerning the meaning of "grave injury" as sufficient ground for granting divorce.

On the other hand, in the United States the legislation on this point is obviously very different from ours. That is why we can not limit ourselves to examining American decisions in order to determine whether the concealment of antenuptial pregnancy should be considered as "grave injury." The statutes of some states expressly provide that antenuptial pregnancy by another man is ground for divorce. 2 Vernier, American Family Laws (1932) 70. In other states "fraud" is ground for divorce and it has been decided that concealment of antenuptial pregnancy constitutes "fraud." *Lyman* v. *Lyman*, 97 Atl. 312 (Conn. 1916); *Kissell* v. *Kissell*, 60 A.2d 834 (Pa. 1948). But in a host of states said pregnancy constitutes *ground for annulment of the marriage*. Kingsley, *Fraud as a Ground for Annulment of a Marriage*, 18 So.Cal. L. Rev. 213 (1945); Vanneman, *Annulment of Marriage for Fraud*, 9 Minn. L. Rev. 497 (1925); Kingsley, *What are the Proper Grounds for Granting Annulments?* 18 Law & Contemp. Prob. 39 (1953). The only exception, which, by the way, is irrational, is that the annulment of the marriage does not lie if the husband *also* had sexual relations with the wife prior to the marriage, even if it is proved that he is not the father of the child. The following is concluded: "He who knowingly bathes in a polluted stream, deliberately contributing contamination to its waters, should not reasonably be surprised at any subsequent revelations as to the character or the extent of its original defilement." *Bahrenburg* v. *Bahrenburg*, 150 N.Y. Supp. 589, 592 (1914). *Cf.* Cahn, The Moral Decision 94–110 (1955). In any event, we realize why it is unnecessary in the United States to decide whether the concealment of antenuptial pregnancy constitutes physical or mental "extreme cruelty." This last

ground for divorce exists in 43 states and corresponds to our "cruel treatment or grave injury." See Vernier, *op. cit. supra* at 24–31.

The legal doctrine which in this concrete case warrants the divorce decree could be undoubtedly invoked if it concerned the deceitful concealment of other serious facts. Thus, for example: lack of virginity of the bride, homosexualism of the husband, the existence of a child born outside the marriage, the venereal disease of a spouse, etc. But there is no practical difficulty nor legal impediment in this. It is for the judge to determine in each case whether "grave injury" exists, applying the views or requirements that we have briefly examined here. It is because of the impossibility of an exhaustive legislation that the standard of "grave injury" as a ground for divorce, comes into play. And the function of the latter is precisely: (1) to embrace the infinite varieties that injurious acts between spouses may entail; and (2) to fix as an index showing the seriousness of the injury—which renders it sufficiently important to constitute a ground for divorce—the impossibility of any marital cohabitation and the destruction of the essential purposes of marriage. In other words, the task of the judge under the doctrine of this case is identical with that which for more than a half a century the courts of Puerto Rico have undertaken without discrepancies or abuse. The only difference is that the application of the test of grave injury in divorce suits extends to acts of the spouses which *begin prior* to the marriage. There is no possibility of saving the judges from that work by establishing canons with minute details. The same thing happens with injurious conduct that *begins after* the marriage. Of course, the conscious and articulated application of flexible standards is a painful process, at times poignant to the mind and heart. But we have no other choice but to do our task authentic. Everything else is but a fancy which, as Ortega says, is the "gap left

by the absent action." And experience shows that the courts, in Puerto Rico will continue solving those problems of "grave injury" as they emerge.

Obviously we are not talking here of granting divorces, without serious grounds. Deceitful concealment constitutes "grave injury" only on very strict grounds. That is why it would be an error to suppose that the enlargement of grave injury to cover these cases would bring marriage to a crisis, or would contribute to the disruption of the family in Puerto Rico. In statistical terms, "cruel treatment or grave injury" was the ground in less than one-fourth of the total of divorces, issued in Puerto Rico during the last decade. On the other hand, separation for a period of three or more years, and desertion are the main grounds for divorce: for example, in 1956 more than 76% of the total number of divorces in Puerto Rico was based on those grounds. See the Annual Reports of the Secretary of Health for the years 1947 to 1956. The danger does not lie in granting the divorce where it is sanctioned or warranted, but in the practice of *collusion* to obtain the dissolution of the bond. This abuse can not lead to the conclusion that divorce must be suppressed in the cases of fraudulent concealment of a fact which impairs the conjugal relationship in its essence. The thing to do is for the courts to exert themselves to the utmost in order to prevent simulations or collusions which really provoke the disruption by *mutual consent* of the spouses.[4]

In order to avoid confusion, it must be set forth that we have only resorted to the French decisions and doctrine "by

---

[4] It is well to indicate that the relation between the legal rules on divorce and the social phenomena that at times are included under the categories of "disorganization of the family" and "instability of the marriage," is not at all clear. See Rheinstein, *The Law of Divorce and the Problem of Marriage Stability,* 9 Vanderbilt L. Rev. 633 (1956); Llewellyn, *Behind the Law of Divorce,* 32 Col. L. Rev. 1281 (1932) and 33 *id.* 249 (1933); Hankins, *Divorce* in 5 Encyclopedia of the Social Sciences 177–85; Baber, Marriage and the Family (1953); and Burgess and Locke, The Family (2d ed. 1953).

way of instructive antecedent" as Scaevola does in his treatise. II *Código Civil* (5th ed. 1946) 784–87. Naturally, the predominant social convictions in France can not be accepted nor applied without further analysis. In each case we would have to determine what constitutes "grave injury" *in the Puerto Rican social sphere*. But as to the deceitful concealment of antenuptial pregnancy by another man, in the concrete circumstances presented by the case at bar, our present social beliefs coincide with those that move French law to characterize such conduct as "grave injury" making it a ground for divorce. On the other hand, we already stated *the legal basis* that permits us to resort to French law as a source of experience to judge the question at bar.

The elaborate development of the notion of grave injury in French doctrine should not be attributed to the fact that the legislator, because of political and religious conflicts, could not make a lengthy enumeration of particular grounds for divorce. This explanation completely ignores the essential: the legislative technique and the legal method in force in the countries of codified law. The French Civil Code, Radbruch states, does not have "a casuistical language" nor is it "dominated by the fancy of deciding beforehand, through exaggerated abstractions, all the legal cases imaginable"; on the contrary, "it consciously waives the pretension of regulating everything, without omissions or gaps." *Introducción a la Filosofía del Derecho* 75 (1951). In other words, far from having a legislative technique based on clear and precise formulas, as the one that predominates in Anglo-American countries, French Civil Law has a legislative technique based on brief, broad and flexible formulas. That is, it makes use of concepts, principles, standards, and general institutions which have the advantage of not wandering into the details of rigid, strict and casuistic rules. As stated by Portalis, one of the editors of the French Code, in his famous speech on the preliminary title before Parliament: "To know

that it is not possible to foresee everything is a wise foresight." And he recognized that: "Regardless of what is done, laws will never fully replace the use of natural reason in the walks of life. The needs of society are so varied, business between men is so active, interests are so manifold, its relations so vast, that it is impossible for the legislator to foresee all. In those same subjects in which the legislator focuses his attention, there is a multitude of details which escape him or which are too questionable and variable to be object of a legislative norm. Besides, how can one stop the action of time? How can one oppose the course of events or change the trend of customs? How can one know and calculate beforehand what only experience teaches us? Can foresight take care of matters that the mind can not reach? No matter how complete a Code may appear, yet codes are never-ending, as becomes evident when the judge confronts a thousand unexpected questions. Many things are, therefore, decided either by the rule of custom, by the discussion of scholars, or by the discretion of the judges. The function of the law is to determine roughly the general precepts of the law: and to establish principles fertile in consequences rather than to go into the details of questions that may arise with regard to each particular matter. It is for the judge and the lawyer, imbued with the general spirit of a legal system to attend to its implementation....." I *Code Civil-Contenant la série des lois qui le composent, avec leurs motifs* 13–17 (1803). That is why the premise of codified law is this: that ". . . the legal provisions are not more obscure because of their generality, but on the contrary, they have the advantage of embodying a greater number of rules, to serve better the needs of a practical and ever-changing life." 2 Huber, *El Derecho y su Realización* 88–89 (Sp. transl. 1929).

Aside from that legislative technique, there is the *method* of investigation, application and interpretation of law used

by the judges and authors, following the contents of the code. The basic ideas of this legal method are that: (1) ". . . the function of the judge or of the interpreter can not be simply reduced to the work of the subsumption of issues of fact under the legal standard, since the judge or the jurist has the burden of the more important mission of particularizing the law, integrating it with new solutions and, within certain limits, adapting it to life and rejuvenating it." Castán, *Teoría de la Aplicación e Investigación del Derecho* (1947) 23; (2) "the work of the jurist in the investigation, elaboration and action of Law is not a mechanical and automatic function but, very far from it, a function that must be governed, in its manifold manifestations (interpretative, systematizing, integrating, corrective, etc.), by the consideration of the purposes of law, and not only of isolated purposes, but of the whole of the law and within the scope of its spirit." *Ibid.*, 361; (3) "In the first level of activity of the jurist . . . there is the material provided by the positive law in point. . . (but) this standard material, as it appears formulated, does not exhaust legal reality . . . it is for legal science to elaborate the legal reality . . . for it must use all the suitable means of knowledge: observation, interpretation, conceptual analysis and synthesis." Hernández Gil, *Metodología del Derecho* 382–83 (1945). The fundamental importance of this law method has been pointed out by Anglo-American jurists. For example: (1) "The attitude of our courts toward statute law presents a contrast to that of the civilians who have been more ready to regard statutes in the light of the thesis of the civil law that its precepts are statements of general principles, to be used as guides to decision." Stone, *The Common Law in the United States*, 50 Harv. L. Rev. 4, 12, 13 (1936); and (2) ". . . The most serious objection to a code in a common-law jurisdiction is that we have no well developed common-law technique of developing legislative texts. Our technique of statutory interpretation is not

adequate to the application of a code." Pound, *Sources and Forms of Law*, 22 Notre Dame Lawyer 1, 76 (1946). See also, Pound, *Common Law and Legislation*, 21 Harv. L. Rev. 383 (1908) and Freund, *Interpretation of Statutes*, 65 U. of Pa. L. Rev. 207 (1917).[5]

This essential fact is thus explained: in instituting grave injury as ground for divorce, the lawmaker establishes in a country of civil law a category that by its breadth comprises, without violence, all the other grounds that produce the dissolution of the bond. If we apply the civilian manner of thinking, all the acts enumerated as specific grounds for divorce are only variations of the sweeping concept of "grave injury." Adultery, conviction of felony, desertion, habitual drunkenness, attempt to corrupt the children, proposal of the husband to prostitute his wife, etc., constitute serious violations of the reciprocal duties stemming from the marriage or highly offensive acts that make the conjugal union impossible and destroy the main purposes of marriage. Only impotence or insanity occurring after marriage may be considered as independent grounds because there is no *animus injuriandi*. Does this mean that the legal enumeration of grounds for divorce is entirely meaningless? The answer is undoubtedly no. The specified grounds are *peremptory*, that is, the judge can not refuse to pronounce a decree of divorce when they are proved. On the other hand, when it

---

[5] We can only treat here lightly and summarily the decisive importance of the legislative technique and law method in the life of codified law. See among others: Gény, *Méthode d'Interpretation et Sources en Droit Privé Positif* (2d rev. ed. 1932); *Id., Science et Technique en Droit Privé Positif* (1924); Husson, *Les Transformations de la Responsabilité—Etude sur la Pensée Juridique* (1947); Bonnecase, *The Problem of Legal Interpretation in France*, 12 Journal of Comp. Legis. and Int. Law 79 (3rd ser. 1930); Renard, *Introducción al Estudio del Derecho* (Sp. transl. 1947); Roubier, *Théorie Générale du Droit* (2d rev. ed. 1951); The Jurisprudence of Interests (Schoch ed. 1948); Koschaker, *Europa y el Derecho Romano* (Sp. transl. 1955); Von Mehren, The Civil Law System (1957) 821–54; and Gutteridge, Comparative Law (2d ed. 1949) 101–16. *Cf.* Pound, *The Theory of Judicial Decision*, 36 Harv. L. Rev. 641, 802, 940.

concerns the other innumerable facts that can be invoked as ground for divorce, the judge has full freedom to evaluate the injurious character of the act and the seriousness thereof, in accordance with the education, social position and other elements of fact that may arise. *Is it clear now why the legislator in France did not feel bound to enumerate generously the particular grounds for divorce?* Moreover, the dogma that attempts to create, as an inevitable consequence of the Puerto Rican system of enumerating causes, a limitation to the ground of "grave injury" relying on the "legislative intent" to curtail judicial discretion, has been found erroneous. This dogma is an unjustified corollary of the alleged restricted character of the legal enumeration. It really concerns a variation of the discredited maxim: *"inclusio unius est exclusio alterius."* And the exemplary attention that the legislator in Puerto Rico has given to the grounds for divorce is reduced to the following: from 1902 to 1959, the Legislature has added two new grounds for divorce: separation and incurable insanity. Three acts have been enacted to that effect in that half century: (1) Act No. 46 of May 9, 1933 (Sess. Laws, p. 304)—added the ground of separation for a period of more than 7 years—(2) Act No. 78 of May 6, 1938 (Sess. Laws, p. 191)—added the ground of incurable insanity—and lastly (3) Act No. 62 of April 29, 1942 (Sess. Laws, p. 582) reduced the separation period to 3 years. Of course, neither the traditional absence of deceit as ground for annulment of marriage in our civil law, nor the elimination of mistake or error in 1902 are material to the grounds of divorce. The significant differences between annulment and divorce with respect to spouses, children, property, etc. are highly known.

The doctrine of the Spanish courts and text writers is so sterile as to the meaning of grave injury that it deserves little mention here. As is known, the civil marriage system was applied in Spain when both spouses did not belong to the

Catholic religion. Furthermore jurisdiction of trials on annulment, dissolution and separation of canonical marriages belongs exclusively to ecclesiastical courts. In the exercise of their exclusive jurisdiction, they apply in those grounds the provisions of canonical law. See V-1 Castán, *Derecho Civil Español, Común y Foral* (7th ed. 1954), 66–115, 446–78. The provisions of the Spanish Civil Code which refer to the grounds for annulment of marriage and the grounds for "divorce" (that is, separation from bed and board), only apply to the *civil* marriages between non-Catholics. Needless to say, civil marriages are very uncommon and divorce cases even more uncommon. As for the rest, in Spain there only exists the imperfect divorce which never causes the dissolution of the bond. Precisely one of the reforms introduced in the Spanish Civil Code by the recent Act of April 24, 1958 was to eliminate the term "divorce" in § § 104 and 107 and substitute it for the expression "separation." See 1 Santamaría, *Comentarios al Código Civil* (1958) 166–68; Ramblas y Majada, *Código Civil—Interpretado y Anotado* (2d rev. ed. 1958) 115–17, pursuant to the changes introduced by the Act of April 24, 1958. The juridical doctrine in that country, aside from being meager, reflects, as is natural, the deep-rooted ideas and beliefs of the Spanish and Catholic tradition concerning the indissolubility of marriage and the immorality inherent in every "divorce." Certainly that is not the trend in Puerto Rico today, and the question of divorce is maintained outside the religious plane. There is an unsurmountable distance between the Spanish world and ours with respect to divorce, without entering here into considerations of goodness or meritoriousness. In this point the social climate in which "we live, move about and are" and the conscious ideas of the people in Puerto Rico are radically different from the Spanish ones. *Cf.* Castán Tobeñas, *La Crisis del Matrimonio* (1914); Giménez Fernández, *La Institución Matrimonial* (1943); Montero, *El Matrimonio y las Causas*

*Matrimoniales* (4th ed. 1945) ; Amo, *La Defensa del Vínculo* (1954) ; Castán, *La Condición Social y Jurídica de la Mujer* (1955). Thus, it seems idle to probe into the Spanish commentators in order to determine our position with a view to finding the correct solution of the issue herein.

It is true that the ground of "grave injury" in Puerto Rico took its origin from § 105 of the Spanish Civil Code of 1889. But the historical approach can not be converted into fanatism or mysticism. For more than half a century the historical development of divorce in our country has followed a different path from the one set by the Spanish legal order. No one could deny that today the differences are radical. Hence the correct interpretation of the concept grave injury does not depend inexorably on the past. The scope of that flexible standard has to be in keeping with our social climate. And it would be a gross error to limit the judicial function by an ungrounded historicism which in reality begs the question raised in this case indicating that the Spanish juridical doctrine has never accepted the deceitful concealment of antenuptial pregnancy as a grave injury with regard to divorce.

When the text of the law resorts to flexible standards (eg. grave injury as ground for divorce), the courts can apply them only if they complete them. Without escape or remission, their legitimate duty consists in developing and adapting the law to the demands of social life. No one can substitute them in that function and their decision in the matter is untransferable. Any intent to leave the solution of the problem to the legislative agencies would be in truth to shirk the responsibility imposed on them by the legislator himself. Thus, said judicial determination can not be characterized as encroachment upon popular sovereignty nor is it tantamount to deciding problems that should be taken to the Legislative Assembly. Since the law delegates on the judges the function of choosing the concrete solution, it is simply

impossible for the latter to act in the form proposed by the political theories of Montesquieu or Rousseau. On the contrary: the courts must create standards of public policy in a conscious and articulated manner. True they can never forget their subordinate position to the law nor adopt solutions that do not conform to the convictions which actually predominate and influence effectively the society in which they live. But it is obvious that within those limits, it is inevitable, in construing the meaning of grave injury, to reconcile the legal principles with the social realities of our atmosphere. They are there and we have to consider them irremissibly. Or what is the same, they are not at the mercy of whether the judges *as officers* want to accept them or not; although *as individuals* they may fight against them if repugnant to them, follow them when desirable, or try to surpass them by creating others of their own invention.

Hence it is a question of an irremediable and inexorable process in the work of adjudication: we have to choose between several possibilities, projecting on the circumstances the design or pursuit of our social life. By this process alone we discover our legal "realities" viewed from their concrete perspective. And thus it is clear that the work of the judges is one of imagination, invention, and art. This can not be concealed by saying noncommittally that the existence of "grave injury" in the deceitful concealment of antenuptial pregnancy may be found only by the interpolation of individual and subjective appreciations. Neither can it be said that the judges can waive their responsibility to formulate standards. As an illustrating simile: Doesn't the same thing occur when the lawmaker delegates to an administrative agency full and flexible powers with a view to carrying out certain ends that he only expresses in general terms or by insinuations? See *López* v. *Planning Board*, 80 P.R.R. 625 (1958) and Frank, Courts

on Trial (1949) 292–309.[6] In the face of the law, the interpreter must remember Heraclitus' thought: "The Lord whose oracle is in Delphi does not say, or conceal, but makes signals." *Fragmentos, Núm. 11,* in Gaos, *Antología de la Filosofía Griega* 80 (1940). And therefore, gently, but with a skilled and steady hand, doctrine and jurisprudence must create satisfactory solutions within the framework set by the legislator.[7]

Summing up: the fault of the wife in the case at bar constitutes in Puerto Rico a sufficiently grave injury to grant the divorce requested by the husband. But the lower court erred in making the additional unnecessary pronouncement that the son born of the marriage on February 21, 1954, that is six months and three days after the marriage, was illegitimate. In the first place, the child was not a party to the divorce suit and in any event, no guardian ad litem was appointed to protect his rights. *Chabrán v. Méndez,* 74 P.R.R. 719 (1953). Besides, in an action brought by a person with a right to challenge the legitimacy,[8] the court

---

[6] *Cf.* also, Rheinstein, *Who Watches the Watchmen?* in *Interpretations of Modern Legal Philosophies—Essays in Honor of R. Pound* (1947) 589–610; Fuller, *Reason and Fiat in Case Law,* 59 Harv. L. Rev. 376 (1946) ; *Id., Positivism and Fidelity to Law,* 71 Harv. L. Rev. 630 (1958) ; Recaséns Siches, *op. cit. supra* at 206–91.

[7] It is understood: the courts enjoy a different margin of discretion according to the standard material that they must apply. The most limited discretion is when it concerns the so-called "strict rules": that is; the application to a particular and detailed hypothesis of facts, a likewise particular and detailed solution. But here it concerns a *standard* (grave injury) which is "the kind of standard at the opposite end . . . (since) the legislator in reality deposits his rule-making power in the hands of the interpreter when the latter must apply in particular situations certain *standards* such as good faith, reasonable conduct, just cause, due care, etc." Puig Brutau, *La Jurisprudencia como Fuente del Derecho* 205 (undated). See the examples of *standards* that Castán gives in *Teoría de la Aplicación e Investigación del Derecho* (1947) 171–73. *Cf.* Pound, Social Control Through Law 35–62, 103–34; *L'Influence du Code Civil dans le Monde—Travaux de la Semaine Internationale du Droit* (1950) 149–327, 331–554; Al-Sanhoury, *Le Standard Juridique* in Recueil Gény 144–56 (1935).

would have to consider the rule that against the legitimacy of children born 180 days after the marriage has been celebrated "no other proof shall be admitted than the physical impossibility of the husband to use his wife within the first one hundred and twenty days of the three hundred days that have preceded the birth of the child." Section 113 of the Civil Code (1930 ed.), 31 L.P.R.A. § 461. See *Cubano* v. *Del Valle*, 69 P.R.R. 538 (1949); Judgment of the Supreme Court of Spain of January 24, 1947, 17 *Jur. Civ.* (2d ser.) 322; II–II Puig Peña, *op. cit. supra* at 33–38 (1953); 1 Manresa, *op cit. supra* 642–80.[9] Likewise we would have to bear in mind the period of prescription of the action to contest the legitimacy of the child: three months after its birth is recorded in the registry, if the husband be in Puerto Rico, or after six months if he should be abroad, reckoning from the time he has knowledge of the birth. Section 117 of the Civil Code (1930 ed.), 31 L.P.R.A. § 465.

In view of the foregoing, the said pronouncement concerning the son should be eliminated and as thus modified the judgment should be affirmed.

---

[8] Pursuant to § 116 of the Civil Code (1930 ed.), 31 L.P.R.A. § 464, legitimacy can only be attacked by the husband or his legitimate heirs in the following cases: (a) if the husband has died before the termination of the period fixed for instituting his action in court, (b) if he shall have died after presenting his action without having desisted from it, and (c) if the child was born after the death of the husband. The child itself can also challenge legitimacy as an incident of the action of filiation provided by Act No. 229 of 1942 (Sess. Laws, p. 1296). See *Agosto* v. *Javierre*, 77 P.R.R. 444 (1954); *Chaulón* v. *Chabrán* 79 P.R.R. 286 (1956) and *Pérez* v. *Torres*, 79 P.R.R. 575 (1956).

[9] The presumption of said § 113 is only applied in an action in which the legitimacy of a son born of the marriage is challenged. Obviously it does not apply in this action of divorce. On the other hand, the "*conclusive*" presumption established by § 463 of the Code of Civil Procedure, 32 L.P.R.A. § 1886, only refers to the case in which the spouses lead a marital life *at the time of conception* and in which the gestation period *is not contrary to the laws of nature*. *Estate of McNamara*, 183 Pac. 552 (Cal. 1919) and *Anderson* v. *Anderson*, 5 P. 2d 881 (Cal. 1931).